UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re LIVINGSOCIAL MARKETING AND SALES PRACTICES LITIGATION | ) ) ) | Misc. Action No. 1:11-mc-0472 (ESH) MDL No. 2254 |
| This Document Relates To: | ) ) ) | |
| ALL CASES | ) ) ) | DATE:    March 7, 2013 TIME:    9:30 a.m. JUDGE:  Honorable Ellen S. Huvelle |

**PLAINTIFFS' RESPONSE TO THE COURT'S FEBRUARY 12, 2013 ORDER
AND OPPOSITION TO OBJECTIONS**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................1

II.     PLAINTIFFS' RESPONSES TO THE QUESTIONS RAISED BY THE COURT IN ITS FEBRUARY 12, 2013 ORDER ............................................................3

      A.     How many Class Members have actually submitted claims and what is the dollar value of those claims?..................................................................3

      B.     Counsel has indicated that "the value of the cash relief available to the Settlement Class and *certain administrative costs*" is $4,500,000. (Plaintiffs' Motion for Attorneys' Fees at 4).  What is the actual amount of the specified administrative costs?  Additionally, what is the nature of those costs, as distinguished from the "approximately $80,000" identified as "additional administrative costs borne by LivingSocial?...................................4

      C.     How does counsel explain the discrepancy between the attorneys' fees requested in *In re Groupon Marketing and Sales Practices Litigation* ("*Groupon*"), 11-md-2238 (N.D. Cal. filed June 2, 2011), and the attorneys' fees requested in the instant case? .........................................5

      D.     How many class members filed claims in *In re Groupon*?  How much of the Settlement Fund has been distributed or is allocated for distribution?.............8

III.    THE OBJECTIONS RAISED BY FLETCHER, BANDAS, MELTON AND SCHAFFZIN DO NOT UNDERMINE THE FAIRNESS, ADEQUACY OR REASONABLENESS OF THE SETTLEMENT....................................................8

      A.     The Positive Response of Class Members Counsels in Favor of Final Approval .............................................................................................8

      B.     No Conflict Exists Between or Among Class Members and Named Plaintiffs.............................................................................................9

      C.     The Court Has No Conflict ..................................................................11

      D.     The Injunctive Relief Is Valuable and Significant.................................11

      E.     The Three Year Duration of the Injunction Does Not Operate as a Prospective Bar to Future Claims ........................................................13

      F.     The *Cy Pres* Award Is Proper ...........................................................13

            1.     *Cy Pres* Awards Are Not Illegal ..............................................14

            2.     The Proposed *Cy Pres* Recipients Have a Demonstrated Commitment to the Very Issues Litigated in This Case ...........................16

3.      *Cy Pres* Distribution Is Appropriate Here Following Distribution of 100% of Out-of-Pocket Losses to Class Members .................................18

G.      The Requested Fee Award Is Fair, Reasonable and Appropriate .........................19

H.      The Notices Fully Apprise Class Members of All Pertinent Information ............22

I.      The Informal Objections Do Not Provide Any Basis to Deny Final Approval ...........................................................................................................23

IV.     BANDAS, FLETCHER AND MELTON HAVE A HISTORY OF OBJECTING TO CLASS ACTION SETTLEMENTS.........................................................................25

A.      Christopher A. Bandas .........................................................................................25

B.      Frederic R. Fletcher .............................................................................................28

C.      Michelle Melton and Cery Perle ..........................................................................29

V.      CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

**Page**

## CASES

*AT&T Mobility LLC v Concepcion*,
____ U.S. ____, 131 S. Ct. 1740 (2011) ..................................................................................5

*Barnes v. Fleet Boston Fin. Corp.*,
No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006) ......................28

*Boyle v. Giral*,
820 A.2d 561 (D.C. 2003) .....................................................................................................18

*Bynum v. Dist. of Columbia*,
412 F. Supp. 2d 73 (D.D.C. 2006) ...........................................................................................8

*California v. Levi Strauss & Co.*,
41 Cal. 3d 460 (1986) ............................................................................................................19

*CompuCredit Corp. v. Greenwood*,
___ U.S. ___, 132 S. Ct. 65 (2012) ..........................................................................................5

*Conroy v. 3M Corp.*,
No. C00-2810 CIN, 2006 U.S. Dist. LEXIS 96169
(N.D. Cal. Aug. 10, 2006) ...............................................................................................27, 28

*Copeland v. Marshall*,
641 F.2d 880 (D.C. 1980) ......................................................................................................12

*DeHoyos v. Allstate Corp.*,
240 F.R.D. 269 (W.D. Tex. 2007) ..........................................................................................25

*Dem. Cent. Comm. of the Dist. of Columbia v. Wash. Metro. Area Transit Comm'n*,
84 F.3d 451 (D.C. 1996) ........................................................................................................15

*Diamond Chemical, Inc. v. Akzo Nobel Chemicals B.V.*,
No. 01-2118, No. 1018 (CKK), 2007 U.S. Dist. LEXIS 49406
(D.D.C. July 10, 2007) .....................................................................................................14, 18

*Embry v. ACER America Corp.*,
No. C09-01808 JIN, 2012 WL 3777163 (N.D. Cal. Aug. 29, 2012) ......................................27

*Gilman v. Independence Blue Cross*,
No. Civ. A. 96-1601, 1997 WL 633568 (E.D. Pa. Oct. 6, 1997) ...........................................21

*Hall v. Pedernales Elec. Coop., Inc.*,
278 S.W.3d 536 (Tex. App. Ct. 2009) ...................................................................................26

817246_1

**Page**

*In re Baan Co. Sec. Litig.*,
   288 F. Supp. 2d 14 (D.D.C. 2003) ....................................................................................20

*In re Baby Prods. Antitrust Litig.*,
   __ F.3d __, slip op. (3d Cir. Feb. 19, 2013)..............................................................15, 16

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   281 F.R.D. 531 (N.D. Cal. 2012)..............................................................................25, 26

*In re Checking Account Overdraft Litig.*,
   No. 1:09-MD-02036-JLK, 2012 WL 456691 (S.D. Fla. Feb. 14, 2012) ................................28

*In re Chipcom Corp. Sec. Litig.*,
   No. CIV. A. 95-11114-DPW, 1997 WL 1102329 (D. Mass. June 26, 1997)........................20

*In re Dept. of Veterans Affairs (VA) Data Theft Litig.*,
   653 F. Supp. 2d 58 (D.D.C. 2009) ....................................................................................14

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   205 F.R.D. 369 (D.D.C. 2002)..................................................................................8, 14

*In re Mercury Interactive Corp. Sec. Litig.*,
   618 F.3d 988 (9th Cir. 2010) ..........................................................................................21

*In re Murchison*
   349 U.S. 133 (1955). .......................................................................................................11

*In re The PMI Group, Inc. Sec. Litig.*,
   No. 3:08-cv-01405-SI (N.D. Cal. Dec. 20, 2010).................................................................20

*In re TD Ameritrade Account Holder Litig.*,
   No. C 07–2852 SBA, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ..............................22, 23

*In re Wal-Mart Wage & Hour Empl. Practices Litig.*,
   No. 2:06-CV-00225-PMP-PAL, MDL 1735, 2010 U.S. Dist. LEXIS 21466
   (D. Nev. Mar. 8, 2010)...........................................................................................26, 27

*Johnson v. Apple, Inc.*,
   No. 1-09-CV- 146501 (Santa Clara Super. Ct.)....................................................................29

*Klier v. Elf Atochem N. Am., Inc.*
   658 F.3d 468 (5th Cir. 2011) ..........................................................................................18

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950).........................................................................................................22

**Page**

*Perle v. Fiero (In re Perle)*,
    No. 06–1971, 2010 WL 6259964 (9th Cir. Dec. 6, 2010) .......................................................29

*Peters v. Nat'l R.R. Passenger Corp.*,
    966 F.2d 1483 (D.C. 1992) ..........................................................................................................22

*Radosti v. Envision Emi, LLC*,
    760 F. Supp. 2d 73 (D.D.C. 2011) .............................................................................................14

*Shames v. Hertz Corp.*,
    No. 07-CV-2174-MMA II (WMC), 2012 WL 5392159
    (S.D. Cal. Nov. 5, 2012) ..............................................................................................................29

*Turabo Med. Ctr. v. Beach*,
    Nos. Civ. 96-2250(DRD) 1997 WL 33810581  (D.P.R. Aug. 13, 1997) ...................................20

*Vista Healthplan, Inc. v. Warner Holdings Co., III, Ltd.*,
    246 F.R.D. 349 (D.D.C. 2007)....................................................................................................20

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §1693..............................................................................................................................................1

28 U.S.C.
    §2042............................................................................................................................................15

Federal Rules of Civil Procedure
    Rule 23 ...................................................................................................................................22, 23
    Rule 23(e)......................................................................................................................................24
    Rule 23(h) .....................................................................................................................................12

817246_1

Plaintiffs Melissa Forshey ("Forshey"), Mandy Miller ("Miller"), Kimberly Pullman ("Pullman"), Sarah Gosling ("Gosling"), Dawn Abbott ("Abbott"), Barrie Arliss ("Arliss"), Cara Lauer ("Lauer") and Amy Schultz ("Schultz") (collectively, "Plaintiffs" or "Named Plaintiffs"), respectfully submit this memorandum of law in response to the Court's February 12, 2013 Order and in opposition to objections.

## I.    INTRODUCTION

As detailed in the Parties' Joint Motion for Final Approval of Class Action Settlement ("Final Approval Motion") (Dkt. No. 38), filed on February 22, 2013, this Settlement provides valuable monetary and injunctive relief to millions of consumers nationwide who purchased LivingSocial Deal Vouchers ("Deal Vouchers"), squarely satisfying the criteria for final approval set forth by legal precedent in this Circuit.

Perhaps the most striking and impressive aspect of this Settlement is that Class Members who made timely and proper claims will receive 100% cash compensation for what Plaintiffs allege to be out-of-pocket losses.  Class Members have no obligation to do any further business with Defendants if they choose not to and may spend this money however and wherever they like.  As detailed in Section II.A, *infra*, 53,315 timely claims have been received.  These claims request a collective total of nearly $1.9 million.  Because the amount sought by the timely claims is less than the total fund of $4.5 million after Settlement administration expenses borne by the fund, there will be no *pro rata* reduction of the relief afforded to Class Members.  Accordingly, Class Members with expired, unredeemed Deal Vouchers stand to receive complete relief for their out-of-pocket losses, with the remainder of the funds directed towards two well-established, not-for-profit organizations which have a demonstrated track record of supporting consumer protections for gift cards and the robust enforcement of the Credit Card Accountability Responsibility and Transfer Act ("CARD Act"), 15 U.S.C. §1693, *et seq.*

The response of Class Members to the Settlement has been very positive, as demonstrated by the *de minimis* number of objections and exclusions that have been filed. After providing notice to more than 10,000,000 Settlement Class Members, only four formal objections ("Formal Objections")[1] were filed. Four other informal objections ("Informal Objections")[2] were submitted, but none of these were filed in compliance with the Court's Preliminary Approval Order and Provisional Class Certification ("Preliminary Approval Order") (Dkt. No. 28) and, as discussed below, two of them could be more aptly characterized as exclusion requests. Importantly, not a single state attorney general, nor the United States Attorney General has filed an objection to the Settlement. Clearly, the relatively minimal number of objections and exclusion requests that have been lodged highlight the fair, reasonable and adequate nature of the Settlement and counsel in favor of this Court granting final approval.

Pursuant to the Court's Order of February 12, 2013 (Dkt. No. 36), Plaintiffs hereby submit this brief to address the Court's specific concerns about the proposed Settlement, as well as the minimal objections that were raised. In Section II of the brief, Plaintiffs address the questions raised by the Court in its February 12, 2013 Order. In particular, Plaintiffs provide the claims data and administrative cost data requested by the Court, as well as address the Court's queries about the *In re Groupon Marketing and Sales Practices Litigation* ("*Groupon*"), including the differences between *Groupon* and the instant Action. As discussed below, the relief provided by the Settlement here is

---

[1]     The Formal Objections included those filed by attorneys Frederic Fletcher (Fletcher Objection) (Dkt. No. 34), Christopher Bandas ("Bandas Objection") (Dkt. No. 33), Katharine T. Schaffzin ("Schaffzin Objection") (Dkt. No. 35), and Michelle Melton ("Melton Objection") (Dkt. No. 37).

[2]     The Informal Objections include those filed by Dave Beeching, Penny Gibson, Heather Bateman, and Joyce Schones. The Informal Objections are attached hereto as Exhibits 1-4 to the Declaration of Phong L. Tran in Support of Joint Opposition to Objections and Plaintiffs' Response to the Court's February 12, 2013 Order ("Tran Decl."), filed concurrently herewith.

streamlined and takes into consideration that LivingSocial did not argue that it has an arbitration clause and class action ban for the entire period, whereas *Groupon* did.

Section III of this brief addresses the minimal objections that were raised here.  As often happens with large, nationwide class action settlements such as this one, a handful of objectors – many of whom focus their law practice on objecting to class action settlements – have objected to this Settlement for various reasons, many of which are frivolous.  As set forth below, these objectors either  misconstrue the terms of the Settlement Agreement or misapply the law.  Further, the objectors' challenges to Plaintiffs' requested award for fees and expenses are meritless.  Finally, in Section IV, Plaintiffs address the relevant factual history concerning the serial objectors appearing in this case in the hope that as the Court carefully considers each objection, it is informed about the goals and credibility of those lodging objections.

For the reasons discussed herein, as well as the reasons set forth in the Parties Joint Motion for Final Approval, Plaintiffs request that the Court overrule the objections and grant final approval of their Settlement Agreement.  Likewise, Plaintiffs' Counsel respectfully requests that the Court grant their Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Award Payments ("Motion for Attorneys' Fees") (Dkt. No. 31).

## II.     PLAINTIFFS' RESPONSES TO THE QUESTIONS RAISED BY THE COURT IN ITS FEBRUARY 12, 2013 ORDER

Plaintiffs hereby respond to each of the questions raised by the Court in its February 12, 2013 order.

### A.     How many Class Members have actually submitted claims and what is the dollar value of those claims?

As reported by the Settlement Administrator, 53,315 claims for settlement relief have been completed and timely submitted, either through the online claim form or by paper claim sent through

the mail.[3]  Declaration of Jennifer M. Keough in Support of Joint Motion for Final Approval of the

Class Action Settlement ("Keough Decl.") (Dkt. No. 38-5), ¶17.  The aggregate dollar value of the

claims submitted is $1,894,803.70.  *Id.*, ¶18.

> **B.     Counsel has indicated that "the value of the cash relief available to the
> Settlement Class and *certain administrative costs*" is $4,500,000.
> (Plaintiffs' Motion for Attorneys' Fees at 4).  What is the actual
> amount of the specified administrative costs?  Additionally, what is
> the nature of those costs, as distinguished from the "approximately
> $80,000" identified as "additional administrative costs borne by
> LivingSocial?**

Pursuant to Paragraphs 1.6 and 2.2(e) of the Settlement Agreement, only certain defined

Claims Processing Costs will be deducted from the Settlement Fund.  Claims Processing Costs

include the costs associated with processing online and paper claims, the operation of the interactive

voice recording ("IVR") telephone line, responding to Class Member communications, and related

project management.  Keough Decl., ¶13; §1.6.  As of February 22, 2012, the total amount of Claims

Processing Costs is $53,951.44.  Keough Decl., ¶19.  The separate, additional administrative costs

borne by LivingSocial include costs associated with the dissemination of email notice, website and

online filing setup, and related projected management.  *Id.*

Based on the foregoing, the sum of the total cash relief to be distributed to Class Members

($1,894,803.70) and the total Claims Processing Costs ($53,951.44) is $1,948,755.14.  After the

value of the total cash relief and the Claims Processing Costs are deducted from the Settlement Fund,

there is a residual amount of $2,551,244.86, which Plaintiffs expect will be designated as the *cy pres*

award.

---

[3]     While a number of claim forms were started, but not completed, Plaintiffs' counsel believe,
based on discussions with numerous Class Members, that this is largely the result of Class Members
beginning the claim process and subsequently recognizing that they had no expired, unredeemed
vouchers for which a claim for reimbursement could be made.

### C.   How does counsel explain the discrepancy between the attorneys' fees requested in *In re Groupon Marketing and Sales Practices Litigation* ("*Groupon*"), 11-md-2238 (N.D. Cal. filed June 2, 2011), and the attorneys' fees requested in the instant case?

While the instant Action and *Groupon* both ostensibly involve claims concerning the marketing and sale of "Daily Deal" vouchers bearing expiration dates and other alleged restrictions, the actions are significantly different in terms of the relative merits of the respective actions, and the form and manner of relief that will be provided under the respective settlements.  For instance, the defendants in *Groupon* argued that the entire class was bound by a mandatory arbitration and class action waiver provisions in Groupon's terms and conditions, which defendants contend would be enforceable under the United States Supreme Court's decisions in *CompuCredit Corp. v. Greenwood*, ___ U.S. ___, 132 S. Ct. 65, 668-69 (2012), and *AT&T Mobility LLC v Concepcion*, ____ U.S. ____, 131 S. Ct. 1740, 1753 (2011), among other decisions.  Tran Decl., ¶4.  Thus, from the outset of the *Groupon* litigation, plaintiffs were confronted by the looming threat that defendants may attempt to compel individual mandatory arbitration, which had such motion been granted, would have effectively terminated the litigation and foreclosed any type of class-wide relief in that case.  Tran Decl., ¶5.  Accordingly, in *Groupon*, the parties were focused on the potential application of the arbitration and class action waiver provisions to the whole class, and discovery was strictly limited to those issues by the court before any other proceedings occurred.  *Id.*

The parties in *Groupon* considered the significant risk of individual mandatory arbitration applicable to the whole class, among other factual and legal circumstances specific to that case, in negotiating and crafting the settlement relief that was ultimately achieved for the settlement class.  Under the *Groupon* settlement, qualified class members with expired and unredeemed vouchers may submit a claim for a "Settlement Voucher" redeemable for the goods and services at the specific merchant designated on the original voucher at the value of the original purchase price.  Tran Decl., ¶6; Tran Decl., Exhibit 16, Amended Stipulation of Class Action Settlement in *Groupon* ("*Groupon*

Stipulation"), §E.1(f).  If the class member is subsequently unable to redeem his or her Settlement Voucher because the merchant is out of business or refuses to honor the Settlement Voucher, the class member may file another claim for a cash refund from the Settlement Fund of: (i) the purchase amount if the Merchant Partner has gone out of business; or (ii) the purchase amount plus an additional 20% of the promotional value of the original Groupon Voucher if the Merchant Partner refuses to honor the Settlement Voucher.[4]  Tran Decl., ¶6; *Groupon* Stipulation, §E.3.

In light of the significant risk of mandatory individual arbitration that plaintiffs faced in *Groupon* and the resulting settlement relief that was achieved there, as well as other compelling factors, Class Counsel agreed to a fee and expense award of $2,125,000 – an amount which represents 25% of the common fund and which was significantly ***less*** than their actual lodestar amount of $2.9 million.  Tran Decl., ¶8; *Groupon* Stipulation, §I.  Notably, the negotiated fee amount in *Groupon* does not include the substantial work that Class Counsel took on after settlement was achieved, such as obtaining final approval, overseeing claims administration, responding to class member inquiries, and responding to any objections and related appeals – further work for which Class Counsel will not receive any compensation.  Tran Decl., ¶8.  Class Counsel were willing to take a significant discount on their attorneys' fees to settle *Groupon* for the benefit of the class.  *Id.*

In contrast to *Groupon,* Defendants in this Action did not assert that the entire Class, as defined in the Consolidated Amended Class Action Complaint ("Consolidated Complaint") (Dkt. No. 10), is subject to mandatory arbitration or class action waiver provisions.  For these reasons,

---

[4]     After each class member's request for a refund is processed and paid, if funds remain after such payments are made, the claims administrator in *Groupon* will send out a second class notice advising class members of a "Second Settlement Fund" that will be used to pay additional requests from class members for refunds based on purchases of Groupon Vouchers after December 1, 2011.  Tran Decl., ¶6; *Groupon* Stipulation, §E.4.

817246_1

among others, the settlement relief provided under the proposed Settlement here is considerably different from the relief in *Groupon*.  Under the proposed Settlement, Class Members with expired, unredeemed Deal Vouchers do not have to submit a claim for another voucher.  Nor are they required to make an affirmative effort after receiving notice of the Settlement to redeem their Vouchers with the original merchant.  Indeed, the Settlement here provides for a simple, streamlined claims process through which Class Members who submit a timely and valid claim will receive a ***direct cash refund of 100% of the purchase price of their expired, unredeemed Voucher***.  ¶2.2.

Moreover, the claims procedure provided under the Settlement here is significantly different from that in *Groupon*, insofar as the claims process has already begun in this case, and Class Members have had the opportunity to submit claims.  ¶¶1.5, 2.2.  Assuming final approval is granted here, qualified Class Members will be able to receive their cash refunds in a relatively short amount of time, as the Settlement requires that they be paid no later than 45 calendar days after the final judgment becomes non-appealable.  §2.2(c).  In *Groupon*, on the other hand, notice of the commencement of the claims process will not even issue until 14 days after the settlement is finally approved and final judgment becomes non-appealable.  Tran Decl., ¶7; *Groupon* Stipulation, §F.1.  Given that appeals are pending and that this claims processing notice has not issued, the potential for protracted delay in *Groupon* is significant.  Tran Decl., ¶7.

In light of the foregoing, there are clear and significant differences between this Action and *Groupon* that warrant the varying fee requests.  There is no compelling reason why Class Counsel here should receive a discount on their fees, as was the case in *Groupon*, nor given the variance in relief, why the fee in *Groupon* should have any reasonable bearing on the appropriate fee award here.  Indeed, Class Counsel seek a modest multiplier of less than 1.5 times their actual lodestar, which is warranted by the excellent settlement relief that was achieved on behalf of the Class, including the ***complete*** cash relief for expired and unredeemed vouchers, the company-wide business

- 7 -

reforms that were implemented as a result of the Settlement, as well as the considerable work that Class Counsel must shoulder going forward, including the prospect of appeals, as have been filed in *Groupon*.

**D.     How many class members filed claims in *In re Groupon*?  How much of the Settlement Fund has been distributed or is allocated for distribution?**

As discussed above, notice of the claim process in *Groupon* has not yet issued and the claims process has not formally commenced; hence, there has been no distribution of the Settlement Fund in that case.  Even though the claims period has not started in *Groupon*, class members have been allowed to file claims early if they wished.  Based on the most recent data provided by the *Groupon* claims administrator, as of February 20, 2013, 61,245 claims have been submitted, for a total purchase price value of $2,428,867.  Tran Decl., ¶9.  The claims submitted in *Groupon* will be subject to review and certification that they are compliant with all claim requirements.

**III.     THE OBJECTIONS RAISED BY FLETCHER, BANDAS, MELTON AND SCHAFFZIN DO NOT UNDERMINE THE FAIRNESS, ADEQUACY OR REASONABLENESS OF THE SETTLEMENT**

**A.     The Positive Response of Class Members Counsels in Favor of Final Approval**

Despite the fact that the Settlement Class in this Action numbers well above 10,000,000 people, only four Formal Objections were filed by Frederic Fletcher, Christopher Bandas (on behalf of Jeremy de la Garza), Katherine Schaffzin and Michelle Melton.  Four objectors out of a Class of 10,000,000 amounts to an objector rate of just .00004%.  Even including the four additional Informal Objections, it takes no more than two hands to count all Class Members that have voiced objection to this Settlement in any respect.  As discussed below, the number of objections stands in stark contrast to the number of claims – well over 53,000 Class Members have filed claims for reimbursement.  The fact that a minimal number of objections to the Settlement were filed is a factor

favoring a grant of final approval.  *See Bynum v. Dist. of Columbia,* 412 F. Supp. 2d 73, 85 (D.D.C. 2006); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 398-99 (D.D.C. 2002).

In any event, none of the four Formal Objections raise a legitimate challenge to the fairness, reasonableness or adequacy of the proposed Settlement.   The Formal Objections assert four overarching arguments: (1) there is a conflict of interest between Class Members and the Named Plaintiffs, as well as an alleged conflict with this Court; (2) the injunctive relief provided by the Settlement is invalid or unreasonable; (3) the *cy pres* award is inappropriate; and (4) Plaintiffs' requested fee and expense award is unreasonable.  As addressed below, none of these arguments have any merit and each should be overruled.

### B.     No Conflict Exists Between or Among Class Members and Named Plaintiffs

As a threshold matter, Objector Schaffzin mischaracterizes the proposed Settlement as imposing an "opt-in" claims process by which Class Members must "forfeit" their "valuable vouchers to join in the class."  Schaffzin Objection at 2.  Objector Schaffzin misconstrues the Settlement, as it does not require opt-in by Class Members, nor does it require Class Members to forfeit anything of value.  Rather, under the clear, unequivocal terms of the Settlement Agreement, Class Members will be entitled to monetary relief if they purchased or received a Deal Voucher that has expired, remains unredeemed and was not subject to a refund.  §2.2

Based on her misunderstanding of the Settlement, Objector Schaffzin argues that there is a conflict between Named Plaintiffs on the one hand, and the Class on the other hand, because she believes that none of the Named Plaintiffs holds a Voucher that still includes both paid and promotional value.  *See* Schaffzin Objection at 9.  Objector Schaffzin apparently believes – mistakenly so – that Class Members who hold vouchers with paid and promotional value remaining may make a claim for reimbursement, but they will only receive the paid value back, which she reasons creates a conflict between Named Plaintiffs who stand to gain 100% relief for out-of-pocket

- 9 -

losses and Class Members who would have to surrender their promotional value before the period for use expires.  Again, a Class Member cannot simply "surrender" his or her Deal Voucher to obtain monetary relief; indeed, the prerequisite for a making a claim for reimbursement is that the Voucher *must* be expired, unredeemed and not subject to a refund.  The circumstances that Objector Schaffzin describes simply do not exist, and there is no conflict between the Named Plaintiffs and the Settlement Class Members.[5]

Similarly, Objector Schaffzin's assertion that Class Members who "forfeit" or "surrender" their Vouchers to join the Class will likely receive *less* than the Vouchers' paid value or purchase price is also incorrect.  As noted above in Section II.A, the Settlement Fund is more than adequate to cover all of the claims submitted by Class Members (totaling $1,894,803.70), who will now receive *100%* of the paid value of their expired, unredeemed Deal Vouchers if final approval is granted. Keough Decl., ¶18.  Finally Objector Schaffzin contends that she and other Class Members are better off excluding themselves from the Settlement because they could simply redeem their Deal Vouchers for full paid value or request a refund directly from LivingSocial for full paid value. Schaffzin Objection at 5.  Objector Schaffzin fails to offer any factual support for her mistaken belief that merchants would honor expired, unredeemed Vouchers, or that such Vouchers would be subject to a full refund.  In fact, the only way for a Class Member to receive complete monetary relief for an expired, unredeemed Voucher is by participating in the settlement claim process, which once final approval is granted, will be subject to judicial enforcement and supervision.

---

[5]      For the same reasons, Objector Schaffzin's contention that the notices and Claim Forms are inadequate because they fail to apprise Class Members that they must relinquish their voucher to opt-in to the Settlement is incorrect.  Schaffzin Objection at 10-11.

C.    **The Court Has No Conflict**

Objector Fletcher makes the bizarre argument that this Court has a "glaring conflict of interest," requiring transfer to another venue because of a reported tax break extended to LivingSocial by the District of Columbia that may potentially be as much as $32.5 million.  Fletcher Objection at 8.  In support of this proposition, Objector Fletcher cites a single 1955 United States Supreme Court case, *In re Murchison*, wherein the same judge who exercised his right under a then-applicable Michigan law to act as a "one-man grand jury," also acted as the judge in the subsequent criminal contempt hearing arising out of that initial inquiry.  349 U.S. 133, 133-34 (1955). Somehow, Objector Fletcher reasons that the holding of *In re Murchison* applies here and would not permit any judge in this District to hear this Action.  This argument borders on the absurd.  The Office of Chief Financial Officer for the District of Columbia indicates that general fund revenue for the District of Columbia in 2013 alone will exceed $6 billion.  This Court receives no compensation from the District of Columbia – United States District Court Judges are paid by the United States government.  More importantly, Objector Fletcher utterly fails to explain how a potential tax break of $32.5 million to LivingSocial over an unspecified period of time would prevent this Court or any judge in this District from fairly adjudicating a controversy involving LivingSocial.  And instead of attaching the underlying bill, of which Objector Fletcher improperly asks this Court to take judicial notice, Objector Fletcher relies upon a *Washington Business Journal* article that provides scant detail about the potential tax break.  In short, Objector Fletcher does not come remotely close to satisfying any standard requiring recusal of this Court or transfer of this Action.

D.    **The Injunctive Relief Is Valuable and Significant**

Certain of the objectors question the value of the injunctive relief in this Action.  Schaffzin Objection at 7-8; Melton Objection at 6.  These attacks fail to acknowledge a basic and undeniable reality: the injunctive relief in this Settlement has substantial value and serves to benefit not only

Class Members, but prospective purchasers of LivingSocial Deal Vouchers.  As set forth in the Expert Report of Alexander J. Hoinsky, MBA, CPA ("Hoinsky Expert Report") (Dkt. No. 31-1) submitted in support of Plaintiffs' request for an award of fees and expenses, this valuable injunctive relief – conservatively estimated at $54 million – will inure to the benefit of Class Members and future purchasers alike.  *See* Hoinsky Expert Report.  Both the D.C. Circuit and the Federal Rules Advisory Committee have recognized that injunctive relief may properly figure in a reasonable award of attorneys' fees.  *See Copeland v. Marshall*, 641 F.2d 880, 907 (D.C. 1980) ("That this litigation sought and obtained substantial equitable relief is highly relevant to the award of a large fee."); Advisory Committee Notes to Fed. R. Civ. P. 23(h) (2003 Amendments) ("[I]t is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fee award.").

Indeed, as a direct result of this Settlement, LivingSocial has agreed to maintain its current practice of not placing an expiration date on the paid value of any Deal Voucher that is shorter than the five-year period of expiry set forth by the CARD Act, or any applicable state law, whichever is **longer**, for a period of at least three years following the Effective Date of Settlement.  §2.4(a).  This injunctive relief effectively guarantees that moving forward Deal Vouchers will be in compliance with the five-year period of expiry set forth by the federal CARD Act, as well as the period of expiry of the applicable state gift certificate law.  Put another way, the paid value of LivingSocial's Deal Vouchers will be redeemable for a minimum of five years, or even longer, depending on the state gift certificate laws (eight of which, like California, forbid expiration).  *See, e.g.*, Consolidated Complaint, ¶139.  Similarly, LivingSocial will maintain its current practice of providing clear and conspicuous disclosures explaining the difference between the paid value and promotional value on its Deal Vouchers, as well as on its Company website.  *Id.*  The injunctive relief provisions provide a meaningful and tangible benefit to Class Members, as well as to prospective purchasers, and serve to

advance an important public interest (*i.e.*, the enforcement of federal and state gift certificate statutes) and the value of this relief should be considered in the determination of fees. *Copeland*, 641 F.2d at 907 ("Where, as here, the relief sought is generally nonmonetary, a substantial fee is particularly important if that statutory purpose is to be fulfilled.").

### E. The Three Year Duration of the Injunction Does Not Operate as a Prospective Bar to Future Claims

Objector Fletcher argues that "After LivingSocial's three (3) year ***probation period*** is over then Living Social [sic] may undertake the same schemes and practices that resulted in these six (6) class actions being filed without fear of reprisal because the Settlement Class will be precluded from petitioning their government for redress pursuant to the Releases." Fletcher Objection at 4 (footnote omitted) (emphasis in original). In making this argument, Objector Fletcher plainly misconstrues the composition of the Settlement Class and the scope and impact of the Release. Here, the Settlement Agreement defines Settlement Class Members as including "all persons in the United States who purchased or received any Deal Voucher prior to October 1, 2012." *See* Settlement Agreement, ¶1.32. The Settlement Agreement further provides that the release of claims only applies to "Settlement Class Members." *See id.*, ¶5.1. Thus, even assuming *arguendo*, that three years in the future after the Final Settlement Date, LivingSocial decides to revert back to the conduct that formed the basis of Plaintiffs' allegations, any future claims based on such conduct would ***not*** be released under the Settlement because those claims would necessarily involve non-class vouchers purchased ***after October 1, 2012***. As a result, any argument that LivingSocial is released from "misleading consumers again after three (3) years" is specious. *See* Fletcher Objection at 4.

### F. The *Cy Pres* Award Is Proper

Certain of the objectors also attempt to challenge the appropriateness of the distribution of the unused Settlement proceeds to *cy pres* recipients. The objectors' arguments range from the patently false argument raised by Bandas that "The Cy Pres Is Illegal," to the equally unavailing

- 13 -

argument raised by Melton that the activities of the proposed *cy pres* recipients are not sufficiently related to the claims of the Class.  *See* Bandas Objection at 1; Melton Objection at 2-4.  As discussed below, each of the arguments raised by the objectors with respect to the proposed *cy pres* award is without merit and should be overruled.

### 1.     *Cy Pres* Awards Are Not Illegal

Among the more frivolous objections is Mr. Bandas' baseless assertion that "The Cy Pres Is Illegal."  *See* Bandas Objection at 1.  In support of this demonstrably false proposition, Mr. Bandas relies upon a single Fifth Circuit ***concurrence***, which has no precedential effect in the Fifth Circuit, let alone the District of Columbia.  *Id.*  Mr. Bandas fails to cite any other cases and, of course, fails to cite any cases from the District of Columbia holding *cy pres* distribution illegal.  This is because no such case exists.

Contrary to Mr. Bandas' assertions, in reality, court after court in the District of Columbia has determined that under the right circumstances – such as those present here – *cy pres* distribution is appropriate.  *See, e.g.*, *Diamond Chemical, Inc. v. Akzo Nobel Chemicals B.V.*, No. 01-2118, No. 1018 (CKK), 2007 U.S. Dist. LEXIS 49406 (D.D.C. July 10, 2007) (following litigation concerning international anti-competitive conspiracy to fix prices for the sale of sodium monochloracetate and monochloroacetic acid in the United States, the court granted a *cy pres* award to fund the development of a Center for Competition Law at The George Washington University Law School); *Lorazepam & Clorazepate*, 205 F.R.D. at 381 (after litigation concerning illegal agreements to monopolize the markets for certain generic anti-anxiety drugs the court approved a *cy pres* distribution with the express condition that "'the funds be used in a manner reasonably targeted to specifically benefit the health care needs of a substantial number of the persons injured by the increased [drug] prices'") (citation omitted); *In re Dept. of Veterans Affairs (VA) Data Theft Litig.*, 653 F. Supp. 2d 58 (D.D.C. 2009) (in a case concerning the theft of a hard drive containing personal

information for numerous veterans the court approved a *cy pres* distribution split between the Intrepid Fallen Heroes Fund and the Fisher House Foundation, non-profit charities that help military personnel, veterans and their families); *Radosti v. Envision Emi, LLC,* 760 F. Supp. 2d 73 (D.D.C. 2011) (in a class action case against a sponsor of three educational youth conferences the court approved a *cy pres* fund that establish educational scholarships).  In sum, a long line of precedent in the District of Columbia supports the use of *cy pres*, where appropriate, and this case is no different.

Mr. Bandas goes on to argue that *cy pres* funds should escheat to the United States government, rather than to charities.  Aside from the fact that this approach would not fulfill the purpose underlying the *cy pres* doctrine – to get "as near as possible" to distributing residual funds to those harmed – it is also premised upon an inapplicable citation to the United States Code.  *See Dem. Cent. Comm. of the Dist. of Columbia v. Wash. Metro. Area Transit Comm'n,* 84 F.3d 451, 455 (D.C. 1996) (discussing the derivation of the term *cy pres comme possible*).  Specifically, in support of this dubious proposition, Mr. Bandas cites 28 U.S.C. §2042, which expressly applies only to funds deposited with the court, not funds independently deposited for settlements (such as these).

Moreover, it should be noted that the *cy pres* award proposed under the Settlement is consistent with the Third Circuit's very recent decision in *In re Baby Prods. Antitrust Litig.*, __ F.3d __, slip op. at 18 (3d Cir. Feb. 19, 2013).  Notably, the Third Circuit in that case declined to strictly limit *cy pres* awards to cases where further individual distributions to class members are economically infeasible.  *Id.*  Rather, the Court noted that *cy pres* awards should generally be accepted as the product of "negotiated compromises" to be evaluated from "the perspective of the class as a whole."  *Id.*

The Third Circuit did, however, vacate the district court's approval of the underlying settlement, which established a settlement fund of $35,500,00, from which any funds remaining after the distribution of cash relief to the class members would be donated to *cy pres* recipients.  At the

time of the fairness hearing, the district court did not know how many claims for settlement relief would be submitted and, as such, ***estimated*** that $8,100,000 would be distributed to class members. *Id.* at 13.  It later turned out that only $3,000,000 would be distributed to class members – far less than the court's estimate – resulting in a *cy pres* distribution of $18,500,000 (less administrative expenses). *Id.* at 9.  The *cy pres* distribution was essentially six times the total cash relief to the class members.  Accordingly, the Third Circuit rejected the district court's approval of settlement because the court was unaware of the amount of the settlement fund that would be distributed to *cy pres* recipients, rather than being directly distributed to the class.  *Id.*

No such uncertainty exists in this case.  As detailed in Section II.A, the Settlement Administrator has reported the total number of claims submitted (53,315) and the aggregate dollar value of the claims submitted ($1,894,803.70).  Keough Decl., ¶18.  Once the $1,894,803.70 in direct cash relief is distributed to Class Members, and the Claims Processing Costs ($53,951.44) are deducted from the Settlement Fund, Plaintiffs expect that the residual amount of $2,551,244.86 will be designated as the *cy pres* award.  Thus, unlike *In re Baby Products*, this Court has all of the facts necessary to determine how the Settlement Fund will be allocated and the reasonableness of the proposed settlement relief.  Moreover, there is nothing to suggest that the prospective allocation and distribution of the cash relief and the *cy pres* award is unfair or improper because Class Members had ample opportunity to submit a claim for full and complete relief for up to 100% of the purchase price of their expired and unredeemed voucher.

### 2.    The Proposed *Cy Pres* Recipients Have a Demonstrated Commitment to the Very Issues Litigated in This Case

Objector Melton takes the position that the *cy pres* recipients do not "appear to deal with the prevention of unfair and deceptive business practices, which was the intended purpose of the class action here."  *See* Melton Objection at 3-4.  Putting aside for a moment the fact that both of these organizations focus substantial time and resources on protecting consumers from unfair and

- 16 -

deceptive business practices generally, this Action is more specifically about the application of the CARD Act and state statutes to the LivingSocial vouchers at issue.  As detailed in the declarations submitted by representatives of Consumers Union and the National Consumers League, both of these organizations have been intimately involved in the same issues raised by this case – including advising consumers about expiration dates and other restrictions on gift cards and advocating for the robust enforcement of the CARD Act.  *See generally* Declaration of Ellen Bloom in support of *cy pres* award to Consumers Union ("Bloom Decl.") and Declaration of Sally Greenberg in support of *cy pres* award to the National Consumers League ("Greenberg Decl.").

Consumers Union has a demonstrated commitment to gift card issues.  Consumers Union, among other things, took out a full page advertisement in the New York Times in 2007 aimed at educating consumers about the "pitfalls and hidden costs of gift cards."  *See* Bloom Decl., ¶8.  Leveraging its grass roots organization and public relations efforts Consumers Union worked diligently to secure passage of the CARD Act and played "a lead role in securing the gift card provision." *See id.*, ¶6.  Likewise, in 2012, Consumers Union lobbied in support of a Senate bill that would expand consumer protections on gift cards including a ban on expiration dates and non-use fees, as well as expanding the breadth of types of cards covered.  *Id.*, ¶7.

The National Consumers League also has been an outspoken advocate of consumer protections for gift card purchasers and users – including directly and openly supporting the CARD Act.  In 2008, National Consumers League called on gift card issuers to adhere to their "Gift Card Holder's Bill of Rights," which included a call for no expiration dates, the removal of unjustified fees and clear and conspicuous disclosure of gift card terms.  *See* Greenberg Decl., ¶7.  The following year (2009), National Consumers League testified before the District of Columbia Committee on Public Services and Consumer Affairs to support the "Gift Card Protection Act of

2009." *Id.* This proposed law was expressly designed to protect consumers in the District of Columbia from a variety of issues and abuses by gift card issuers. *Id.*, ¶6.

Despite objectors' assertions, the proposed *cy pres* award bears a close relationship to the underlying purpose of the litigation and will benefit the Settlement Class because both the National Consumers League and Consumers Union will devote the residual funds toward their ongoing efforts to educate and protect consumers against deceptive practices relating to the sale and marketing of gift certificates, as well as toward their ongoing efforts to enforce the CARD Act. *See Diamond Chem.*, 2007 U.S. Dist. LEXIS 49406, at *2; *see also Boyle v. Giral*, 820 A.2d 561, 569-70 (D.C. 2003).

### 3.  *Cy Pres* Distribution Is Appropriate Here Following Distribution of 100% of Out-of-Pocket Losses to Class Members

Objector Bandas also argues that a *cy pres* distribution is inappropriate because "It Is Unfair to Compensate Cy Pres Recipients Before Class Members." *See* Bandas Objection at 1. This assertion mischaracterizes the facts of this Action and the reality of this Settlement. This situation is a far cry from the facts of the solitary case cited by Mr. Bandas. In *Klier v. Elf Atochem N. Am., Inc.*, the named plaintiff sued to prevent a *cy pres* distribution after he received just $6,500 in settlement proceeds after suffering from peripheral neuropathy and leukemia that so severely weakened his heart that he required open-heart surgery. 658 F.3d 468, 472 (5th Cir. 2011). Here, the Settlement Agreement only distributes residual funds after the 180-day period in which Settlement Class Members can cash their settlement checks has expired. *See* Settlement Agreement, ¶¶2.2(d) and 2.3. In short, the *cy pres* distribution in this case will only occur after every Class Member has first had an opportunity to receive 100% reimbursement for all out-of-pocket loses, nothing like the single case cited by Mr. Bandas.

Moreover, while Mr. Bandas argues that the Consolidated Complaint's prayer for "punitive damages and other damages in excess of pure compensatory damages" support his assertion that claimant Class Members should receive further compensation, a similar argument was rejected in *Lupron Mktg. and Sales Practices Litig.*, 677 F.3d 21, 36 (1st Cir. 2012). As the First Circuit noted when rejecting the argument that class members who recovered "full damages" under the settlement should receive the remaining settlement funds (instead of the proposed *cy pres* recipients) due to the complaint's prayer for treble damages:

> Because the consumer fund was established for the benefit of all consumer purchasers of Lupron, not just the 11,000 who filed claims, the court appropriately determined that the "next best" relief would be a cy pres distribution which would benefit the potentially large number of absent class members. . . . Commentators have agreed that distributing residual funds to claimants who have already recovered their losses "necessarily results in an undeserved windfall for those plaintiffs, who have already been compensated for the harm they have suffered."

> \*     \*     \*

> We agree that allowance of such windfalls "could create a perverse incentive among victims to bring suits where large numbers of absent class members were unlikely to make claims. It might also create an incentive for the represented class members to keep information from the absent class members."

677 F.3d at 34-35 (citations and footnotes omitted); *see also California v. Levi Strauss & Co.*, 41 Cal. 3d 460, 476 (1986) ("[C]laimant fund sharing provides no benefits to silent class members. Further, if there is a windfall, it goes not to further the purposes of the substantive law . . . .").

In short, the *cy pres* distribution here truly works as the "next best" relief for the Class.

### G.    The Requested Fee Award Is Fair, Reasonable and Appropriate

Bandas, Fletcher and Melton, who, as discussed in Section IV, *supra*, have been previously deemed as serial or professional objectors, make various unavailing attacks upon the requested attorneys' fee award. Bandas Objection at 2-7; Fletcher Objection at 8-9; Melton Objection at 4-10. In support of their positions, they employ canned, boilerplate arguments obviously recycled from

prior objections.  Collectively, these objections cite two District of Columbia cases relating to attorneys' fees.[6]

Plaintiffs have provided significant precedent supporting the requested fee and expense award in their opening brief – even without factoring in the substantial value created by the injunctive relief in this Action or the significant amount of work not yet completed.  *See, e.g.*, *Vista Healthplan, Inc. v. Warner Holdings Co., III, Ltd.*, 246 F.R.D. 349, 364 (D.D.C. 2007) (common fund fee awards in the District of Columbia typically "'range from fifteen to forty-five percent'") (citation omitted).  Considering the fee request by lodestar analysis, Plaintiffs likewise provided ample precedent supporting the modest multiplier of less than 1.5 requested here.  *See, e.g.*, *In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14, 19-20 (D.D.C. 2003) (finding that "a multiplier of 2.0 or less falls well within a range that is fair and reasonable").

Arguments concerning the timing of payment and allocation of fee awards are similarly without merit.  Bandas Objection at 4-7; Melton Objection at 8-9.  The Bandas and Melton Objections fail to cite a single case holding a "quickpay" provision improper.  Contrary to their assertions, federal courts have long approved settlements with provisions for payment of fees prior to final disposition.  *See, e.g.*, *In re The PMI Group, Inc. Sec. Litig.*, No. 3:08-cv-01405-SI, Dkt. No. 105 (N.D. Cal. Dec. 20, 2010) (ordering immediate payment of attorneys' fees and expenses); *In re Chipcom Corp. Sec. Litig.*, No. CIV. A. 95-11114-DPW, 1997 WL 1102329, at *10 (D. Mass. June 26, 1997) (approving settlement stipulation authorizing payment of attorneys' fees upon entry

---

[6]     And it indeed appears that Objector Melton copied verbatim the only two District of Columbia cases in her objection straight from Plaintiffs' brief.  This is clear because the quote is identical and the citation to *Swedish Hospital* – the only one in her brief – is a short form citation.  *Compare* Plaintiffs' Memorandum of Law In Support of Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Inventive Award Payments (Dkt. No. 31) at 13, *with* Melton Objection at 5.

of judgment "despite the existence of any objections filed to the Fee and Expense Award, the potential for Appeal from the Fee and Expense Award, or collateral attack on the Settlement or any part thereof"); *Turabo Med. Ctr. v. Beach*, Nos. Civ. 96-2250(DRD), *et al.*, 1997 WL 33810581, at *5 (D.P.R. Aug. 13, 1997) (ordering payment of attorneys' fees within 30 days of entry of final approval order); *Gilman v. Independence Blue Cross*, No. Civ. A. 96-1601, 1997 WL 633568, at *15 (E.D. Pa. Oct. 6, 1997) (ordering fees and costs to be paid from the settlement fund 31 days after entry of final approval order). And, importantly, Plaintiffs' Counsel must execute a promissory note in order to receive payment, which requires a full return of the Attorneys' Fees and Cost Fund ***with interest*** in the event that the Final Judgment is reversed. *See* Settlement Agreement, §2.5(g). It is impractical to create a settlement where Class Members would agree to return funds as Class Counsel have agreed to do here. There is nothing improper about the "quickpay" provision as it ensures Class Counsel's interests are aligned with the Class because if a reversal occurs a full return of all fees and costs (again, ***with interest***) is required.

The Bandas Objection cites *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) for the argument that insufficient detail was provided concerning the requested attorneys' fees. The Bandas Objection goes on to claim that the fee request fails to provide "even the bare bones of who seeks what . . . ." Bandas Objection at 6. The Bandas Objection is shockingly false, both in its application of case law and its characterization of the facts. In *Mercury Interactive*, the objectors were not provided the attorneys' fee request until after the deadline for objections had passed so they only had a gross total. Here, the attorneys' fee request was filed on January 18, 2013, and the deadline for objections was February 8, 2013. Each firm involved in the case provided a declaration attaching detailed time records for every attorney and paralegal that performed work in

- 21 -

this litigation.  In short, with respect to the attorneys' fee request, the Bandas Objection is obviously boilerplate, wrong on the facts and the law and should be summarily overruled.[7]

Finally, the Melton Objection makes numerous disparaging statements about the amount and novelty of the legal work involved.  For example, the Melton Objection summarily concludes that "minimal legal work has been performed."  Melton Objection at 6.  Yet, the billing records were publicly filed in advance and the Melton Objection could have, but failed to challenge them in any substantive respect.  Likewise, the Melton Objection fails to account for the considerable discovery in this Action or the novelty of litigation of the statute at issue – the Melton Objection makes these assertions without citing a single case interpreting the CARD Act.

### H.   The Notices Fully Apprise Class Members of All Pertinent Information

Objector Schaffzin makes a variety of arguments concerning alleged deficiencies in the Long-Form and Short-Form notices.  Notably, Objector Schaffzin does not say that she was in any way misled by the notices, nor does she point to any Class Members that were.  Rather, Objector Schaffzin merely claims that someone could hypothetically be misled.  There is no record to support this assertion.  In addition, Objector Schaffzin fails to cite any case law even suggesting that the notice in this Action was improper or insufficient.  And again, Objector Schaffzin's challenge to the notices is based on her assumption that Class Members must opt-in to the Settlement and forfeit something of value – which, as discussed in Section II.C, is patently false.  Clearly, the notices reviewed by the Court and sent to Class Members conform with due process and adequately advise Class Members of their rights.

---

[7]    Mr. Bandas' history of filing boilerplate objections is detailed in §IV.1 below.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, notices must be "'reasonably calculated . . . to apprise interested parties'" of the pendency of the action and afford them an opportunity to present their objections. *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. 1992) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)); *see also In re TD Ameritrade Account Holder Litig.*, No. C 07–2852 SBA, 2011 WL 4079226, at *10 (N.D. Cal. Sept. 13, 2011) ("[T]here is no requirement that notice be perfect."). Here, the Parties provided notice to the very email accounts used by Class Members to make the purchases at issue and provided a robust website that included all pertinent case documents and the capacity to quickly and efficiently make claims online or by mail.

This Court found that the notice to the Settlement Class by way of direct email and website publication constitutes "the best method for providing such notice that is practicable under the circumstances and constitutes valid, due, and sufficient notice to all Settlement Class Members of their rights and obligations, complying fully with the requirements of Rule 23 of the Federal Rules of Civil Procedure, due process, and any other applicable law." Preliminary Approval Order at 2. The Court further held that the Long-Form Notice and Short-Form Notice "comply with due process and Rule 23 because they are reasonably calculated to adequately apprise Settlement Class Members of (i) the pending lawsuit; (ii) the proposed Settlement; and (iii) their rights, including the right to either participate in the Settlement, exclude themselves from the Settlement or object to the Settlement." *Id.*

## I.     The Informal Objections Do Not Provide Any Basis to Deny Final Approval

Four informal "objections" were also received by the Settlement Administrator. These "objections" fail to satisfy the criteria for inclusion as proper objections, insofar as they were not properly served on the Court, Class Counsel and Defendants' Counsel, pursuant to §3.7, or failed to provide the specific information required by §3.7(a). Plaintiffs' Counsel, nevertheless, have attached

these informal objections and briefly address them here.  These informal objections should be overruled.

On November 24, 2012, Class Member David Beeching wrote a brief email explaining that he was a "satisfied user" of LivingSocial and that he objected to the attorney payout.  *See* Exhibit 1. Mr. Beeching expressed strong feelings about lawyers and class actions generally, but his comments offer nothing to assist the Court in ruling on the merits of this Settlement.  *See TD Ameritrade*, 2011 WL 4079226, at *12 ("Ms. Lamy's apparent concern for Ameritrade is inapposite, since the purpose of Rule 23(e)'s final approval process is the protection of absent class members, and not the defendant.").

On November 25, 2012, Penny Gibson sent an email to the Settlement Administrator highlighting very positive experiences with LivingSocial.  Ms. Gibson states in her closing sentence "I wish to exclude myself from this class action lawsuit and file this objection to it."  *See* Exhibit 2. The cases are legion that one cannot object and exclude oneself simultaneously.  It appears from the face of the "objection" that Ms. Gibson is actually seeking exclusion.

On November 26, 2012, Heather Bateman sent an email to the Settlement Administrator indicating that she wished to object to the Settlement because of the "many great deals and bargains" she received though LivingSocial and sites like it.  *See* Exhibit 3.  She explained that she believed the terms of the deals were clearly laid out.  *Id.*  Perhaps because Consumers Union has "union" in its name, Ms. Bateman went on to express concern that the *cy pres* awards were going to "unions." *Id.*  Finally, Ms. Bateman concludes by requesting that "you wouldn't 'protect' consumers such as myself, who are fully capable of ***not*** purchasing something when the guidelines are laid out quite clearly before I ever make the purchase."  *Id.* (emphasis in original).  Given the last sentence, it is unclear that Ms. Bateman is actually intending to object and that she may, in fact, prefer exclusion.

- 24 -

Finally, in correspondence dated November 26, 2012, Joyce Schones indicates that the "lawsuit is ridiculous." *See* Exhibit 4. However, it is unclear that Ms. Schones fully understands the grounds for the suit as she suggests that it could "easily be settled monetarily between the party involved and LivingSocial with refunds and even additional credit." *Id.* While Ms. Schones is completely within her rights to express her opinions about the Settlement, these opinions do not provide assistance to the Court in evaluating the merits of the Settlement at bar as this Action involves many more people than the "party involved."

In sum, the Informal Objections do not offer substantive criticism that would support denial of final approval and should be overruled.

## IV.     BANDAS, FLETCHER AND MELTON HAVE A HISTORY OF OBJECTING TO CLASS ACTION SETTLEMENTS

Of the objections filed, at least three were filed by individuals who can be classified as "professional" or "serial" objectors to class action settlements. Plaintiffs respectfully submit that these objectors are attempting to hold up the Settlement for their own pecuniary or other gain.

### A.     Christopher A. Bandas

Christopher A. Bandas, representing objector Jeremy de la Garza, has a long history of filing meritless objections in attempts to obtain legal fees from the settlement class with frivolous, boilerplate objections. Courts have taken note of this conduct. For example, in *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012), the court granted a motion to compel discovery from an objector suspected to be represented by Bandas. In its order, the *In re Cathode* court stated:

> Hull previously objected to another class settlement in which he was assisted by attorney Christopher Bandas, a "professional" or "serial" objector located in Corpus Christi, Texas. In fact, Hull's objection in this case was postmarked in Corpus Christi, Texas, even though Hull lives and works in Denver, Colorado. Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain;[FN] he has been excoriated by Courts for this conduct. *See* Dkt.

No. 1089–1 (Appendix A thereto listing courts' comments regarding Bandas's conduct). [FN]

*Id.*[8]  In a footnote, the court in *In re Cathode* further observed:

> For example, in *Brown v. Wal–Mart Stores, Inc*., the court stated that "Bandas is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees.' . . . [Bandas's and his clients'] attempt to inject themselves at the last minute into this eight year litigation constitutes an effort to extort money from the Class and/or Class Counsel." *See* Dkt. No. 1062–1, p. 11 of 26 (Order entered in *Brown v. Wal–Mart Stores, Inc*.).

*Id*. at n.4.  The court determined that Hull's objection was "without merit" and overruled it on the grounds that he "failed to submit proof or otherwise establish that he was a member of the Class, and therefore lacks standing to challenge the settlement."  Tran decl., Exhibit 9, Order Granting Final Approval of Settlement with Chunghwa Picture Tubes, Ltd., at 3-4 (Dkt. 1105).  Hull was then ordered to appear for a deposition in part to allow plaintiffs the opportunity to "explore his relationship with Bandas and his practices with regard to asserting settlement objections."  *In re Cathode*, 281 F.R.D. at 533-34.

Other courts have issued opinions echoing the *In re Cathode* and *Brown* courts' conclusions that Bandas holds his own interests above those of the class.  In *Mussman v. Wal-Mart Stores, Inc*., No. LACV-27486 (Iowa Dist. Ct., Clinton Cty.), the court addressed Bandas' history of objecting, through class members in states across the country, to proposed settlement agreements in wage and

---

[8]     Plaintiffs have attached as Exhibit 5 to the Tran Decl., Dkt. No. 1089-1 at 12-22, Appendix A to the Notice of Motion and Motion to Compel Discovery From Objector Hull, from the *In re Cathode* case, which provides approximately 20 examples of cases in which Bandas has filed objections and dismissed, abandoned or withdrawn the objections or appeal without attaining settlement changes or additional benefits for the class.  Additionally, Bandas' objections have been rejected or withdrawn in numerous other cases.  *See, e.g*., *DeHoyos v. Allstate Corp*., 240 F.R.D. 269, 275 (W.D. Tex. 2007); *In Re: Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 2047 (E.D. La.), Dkt. Nos. 15859, 16357, 16570, attached as Exhibits 6-8 to the Tran Decl.; *Hall v. Pedernales Elec. Coop., Inc*., 278 S.W.3d 536, 539 (Tex. App. Ct. 2009).

hour class actions against Wal-Mart.[9]  Tran Decl., Exhibit 10, October 7, 2009 Order Regarding

Terry Healy's Objection and Motion to Intervene, at 7-9.  The *Mussman* court recounted Bandas'

misrepresentations to the court in the South Carolina Wal-Mart action, and concluded that "[t]he

consistency of attorney Bandas' errors and the similarity between attorney Bandas' objections across

different cases demonstrates the canned nature of the objection and reveals attorney Bandas' true

motives." *Id*. at 8.  The *Mussman* court ultimately wrote that it "is concerned that attorney Bandas is

seeking to wrongfully use the class action settlement and objection process for personal gain, and

without any corresponding benefit to any individual objector or the settlement class as a whole." *Id*.

at 12.

One court found Bandas in contempt and imposed sanctions on him after noting his "history

of failing to comply with the Court's orders."  *Embry v. ACER America Corp*., No. C09-01808 JIN,

2012 WL 3777163, at *2 (N.D. Cal. Aug. 29, 2012) ("Objector Bandas' failure to comply with the

Court's July 31 Order and August 22 Order warrants a finding that Objector is in contempt, and

imposes the sanction of striking Objector's objection to the Final Settlement.").  Other courts have

simply found that Bandas' objections are substantively baseless.  For example, in *Conroy v. 3M

Corp*., No. C00-2810 CIN, 2006 U.S. Dist. LEXIS 96169, at *10-*12 (N.D. Cal. Aug. 10, 2006),

where Bandas objected and appealed the granting of final approval of a class action settlement, the

court required Bandas to pay a $431,167 appeal bond after it found that Bandas' objections were

---

[9]      Other courts have recognized Bandas' substantial history of objecting to class action
settlements and appealing final approval orders.  For example, Bandas objected and appealed in *In re
Wal-Mart Wage & Hour Empl. Practices Litig*., No. 2:06-CV-00225-PMP-PAL, MDL 1735, 2010
U.S. Dist. LEXIS 21466, at *14-*15 (D. Nev. Mar. 8, 2010) on behalf of objector Jessica Gaona.
The court determined that Bandas' objections were "not supported by law or the facts and are indeed
meritless," and required Bandas to post a $500,000 appeal bond. *Id*. at *16, *18.  In doing so, the
court noted that Bandas has a "documented history of filing notices of appeal from orders approving
other class action settlements, and thereafter dismissing said appeals when they and their clients
were compensated by the settling class or counsel for the settling class." *Id*. at *17.

"unfounded" and that his appeal was "unlikely to succeed." Specifically, Bandas argued "that the Clayton Act does not authorize the award of fees against a 'prevailing plaintiff.'" *Id.* at *9 (citation omitted). The court rejected this argument, reasoning that it "misses the mark" because the Clayton Act's determination of costs includes attorneys' fees and Bandas "offers no contradictory analysis or legal authority." *Id.* In short, while counsel recognize this Court has an obligation to carefully review this Settlement and the claims of all objectors, this is not the first time that attorney Bandas has made a questionable objection with questionable motivations. Indeed, it is not even the first time that attorney Bandas has filed a questionable objection with this very objector. *See Bobowski v. Clearwire Corp.*, No. C10-1859 JLR (W.D. Wash. 2010) (objection filed by Mr. Bandas also using Jeremy de la Garza as the objector), Tran Decl., Exhibit 11.

### B.     Frederic R. Fletcher

Frederic R. Fletcher, like Bandas, has previously objected to class action settlements in attempts to recover fees while halting the distribution of settlement benefits to class members. Also, like Bandas, Fletcher's motivation has been questioned by at least one court. For example, Fletcher was an objector in *In re Checking Account Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2012 WL 456691, at *1 & n.1 (S.D. Fla. Feb. 14, 2012), where the court overruled the objections to the settlement and ordered Fletcher and others to post an appeal bond. The court explained:

> [M]ost if not all of the Objections are motivated by things other than a concern for the welfare of the Settlement Class. Instead, they have been brought by professional objectors and others whose sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto.

*Id*. at *2. In its opinion, the court stated that it agreed with the court in *Barnes v. Fleet Boston Fin. Corp.*, No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072, at *3-*4 (D. Mass. Aug. 22, 2006), that, "[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost:

Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing."

### C.     Michelle Melton and Cery Perle

Michelle Melton and Cery Perle submitted a joint objection to the proposed Settlement, and both have been involved in objecting to class action settlements in the past.  Perle's arguments in *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA II (WMC), 2012 WL 5392159, at *12 (S.D. Cal. Nov. 5, 2012), were specifically addressed by the court and rejected.  The *Shames* court made note of Perle's lack of recitation to any Ninth Circuit precedence and lack of understanding of the settlement terms.  *Id.* at *12 & n.10.  Melton has a history of objecting to settlements as well, including objecting to a proposed settlement and appealing final settlement approval in *Batmanghelich v. Sirius XM Radio Inc.*, No. 2:09cv9190 (C.D. Cal.), Dkt. Nos. 75, 94 (Tran Decl., Exhibits 12-13.  Melton eventually dismissed her appeal and withdrew her objection, which contained many of the same arguments she regurgitates here.  *See id.*, Exhibits 12, 14-15 (Dkt. Nos. 75, 100, 105).

Melton and Perle have also been associated with multiple professional objectors.  For example, both have been associated with Darrell Palmer, a professional objector who maintains an office in Solana Beach, California, where he focuses almost exclusively on objecting to class action settlements. *See Perle v. Fiero (In re Perle)*, No. 06–1971, 2010 WL 6259964 (9th Cir. Dec. 6, 2010) (unpublished).  Palmer was counsel for Melton as well as Edmund Bandas, (brother of Christopher Bandas), in the *Sirius XM Radio* matter.  In addition to the *Sirius XM Radio* case, Edmund Bandas also has a history of objecting under the representation of Darrell Palmer.  *See Johnson v. Apple, Inc.*, No. 1-09-CV- 146501 (Santa Clara Super. Ct.).  Given the prior connections between Objector Melton and Attorney Bandas, one reasonably wonders whether they are colluding here.

**V.     CONCLUSION**

For all of the reasons set forth herein and in the Parties' Joint Motion for Final Approval, Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate.   Plaintiffs respectfully request that the Court overrule each objection and grant final approval of the Settlement and enter the Judgment and Dismissal with Prejudice.  Plaintiffs also request that the Court grant the full award of fees and expenses.

Respectfully submitted,

DATED:  February 25, 2013

ROBBINS GELLER RUDMAN
   & DOWD LLP
JOHN J. STOIA, JR.
RACHEL L. JENSEN
THOMAS R. MERRICK
PHONG L. TRAN


_____
               s/ John J. Stoia, Jr.
               JOHN J. STOIA, JR.

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

DATED:  February 25, 2013

CUNEO GILBERT & LADUCA, LLP
CHARLES J. LADUCA (DC Bar 476134)
WILLIAM H. ANDERSON (DC Bar 502380)


_____
               s/ Charles J. LaDuca
               CHARLES J. LADUCA

507 C Street, NE
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

WITES & KAPETAN PA
MARC A. WITES
JONATHAN STEPHEN BURNS
4400 N Federal Highway
Lighthouse Point, FL  33064
Telephone:  954/570-8183
954/354-0205 (fax)

CARNEY GILLESPIE ISITT PLLP
CHRISTOPHER ROBERT CARNEY
100 W. Harrison Street, Suite N440
Seattle, WA  98119
Telephone:  206/445-0220

MYLES A. SCHNEIDER & ASSOCIATES,
    LTD.
MYLES A. SCHNEIDER
710 Dodge Avenue, NW, Suite A
Elk River, MN  55330
Telephone:  763/315-1100
877/294-4254 (fax)

BONNETT FAIRBOURN FRIEDMAN
    & BALINT
ANDREW S. FRIEDMAN
ELAINE A. RYAN
PATRICIA N. SYVERSON
2325 E. Camelback Road, Suite 300
Phoenix, AZ  85016
Telephone:  602/274-1100
602-798-5825 (fax)

AUDET & PARTNERS, LLP
MICHAEL A. McSHANE
221 Main Street, Suite 1460
San Francisco, CA  94105
Telephone:  415/568-2555
415/576-1776 (fax)

HALUNEN & ASSOCIATES
CLAYTON D. HALUNEN
1650 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone:  612/605-4098
612/605-4099 (fax)

BOLEN ROBINSON & ELLIS, LLP
CHRISTOPHER M. ELLIS
202 S. Franklin, 2nd Floor
Decatur, IL  62523
Telephone:  217/429-4296
217/329-0034 (fax)

LEVIN, FISHBEIN, SEDRAN & BERMAN
CHARLES E. SCHAFFER
510 Walnut Street, Suite 500
Philadelphia, PA  19106-3697
Telephone:  215/592-1500
215/592-4663 (fax)

Attorneys for Plaintiffs

- 31 -

817246_1

**ECF CERTIFICATION**

The filing attorney attests that he has obtained concurrence regarding the filing of this document from the signatories to this document.

Dated: February 25, 2013                          By:   s/ John J. Stoia, Jr.
                                                       JOHN J. STOIA, JR.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 25, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 25, 2013.

s/ John J. Stoia, Jr.
JOHN J. STOIA, JR.

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:    jstoia@rgrdlaw.com

# Mailing Information for a Case 1:11-mc-00472-ESH-AK IN RE: LIVINGSOCIAL MARKETING AND SALES PRACTICES LITIGATION- MDL NO. 2254

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **William H. Anderson**
  wanderson@cuneolaw.com,halunen@halunenlaw.com

- **Christopher A. Bandas**
  cbandas@bandaslawfirm.com

- **Jonathan Stephen Burns**
  jburns@wklawyers.com

- **Jay S. Carlson**
  JayCarlson.legal@gmail.com

- **Christopher Robert Carney**
  christopher.carney@cgi-law.com

- **Michelle C. Doolin**
  mdoolin@cooley.com,bambrose@cooley.com

- **Christopher B Durbin**
  cdurbin@cooley.com

- **Christopher M. Ellis**
  cellis@brelaw.com

- **Shaun Van Eyk**
  shaun@vaneyk-moore.com

- **Sean P. Gillespie**
  sean.gillespie@cgi-law.com

- **Craig Alan Guthery**
  cguthery@cooley.com

- **Kenan Lee Isitt**
  kenan.isitt@cgi-law.com

- **Rachel L. Jensen**
  rachelj@rgrdlaw.com

- **Michael Joseph Klisch**

mklisch@cooley.com,bnelson@cooley.com

- **Charles J. LaDuca**
  charlesl@cuneolaw.com

- **Thomas Robert Merrick**
  tmerrick@rgrdlaw.com

- **Michael G. Rhodes**
  mrhodes@cooley.com,rlopez@cooley.com,pmoyes@cooley.com

- **Myles A. Schneider**
  myles@maschneider.com

- **John J. Stoia , Jr**
  jstoia@rgrdlaw.com,e_file_sd@rgrdlaw.com,ldeem@rgrdlaw.com

- **Patricia N Syverson**
  psyverson@bffb.com

- **Michael Ross Tein**
  tein@lewistein.com

- **Darcie Tilly**
  dtilly@cooley.com

- **Phong L. Tran**
  ptran@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
FREDERIC FLETCHER
30025 Alicia Parkway
Apartment G340
Laguna Niguel, CA 92677

MICHELLE MELTON
1570 Lake Druze
Cardiff, CA 92007

CERY PERLE
13590 Jog Road
Suite C-6
Delray Beach, FL 33446

KATHARINE TRAYLOR SCHAFFZIN
1362 Poplar Ridge Drive
Memphis, TN 38120
```