**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                              )
In re LIVINGSOCIAL MARKETING AND              )
SALES PRACTICE LITIGATION                          )
_____)
                                                              ) Misc. Action No. 11-mc-0472(ESH)
**This Document Relates To:**                            ) MDL Docket No. 2254
                                                              )
**ALL CASES**                                                  )
**11-cv-0745, Forshey v. Living Social Inc.,**          )
**11-cv-1208, Miller v. LivingSocial Inc.,**              )
**11-cv-1533, Pullman v. Hungry Machine, Inc.,**     )
**11-cv-1532, Gosling v. Hungry Machine, Inc.,**      )
**11-cv-1535, Abbott v. Hungry Machine, Inc., and**  )
**11-cv-1697, Schultz v. Hungry Machine, Inc.**       )
_____)

## MEMORANDUM OPINION

Eight named plaintiffs,[1] on behalf of a class of 10.9 million consumers, sued defendants

LivingSocial, Inc. ("LivingSocial") and Jack's Canoes and Kayaks, LLC, d/b/a Jack's

Boathouse ("Jack's Boathouse") (collectively, "defendants"), alleging that defendants market

and sell gift certificates, marked as "Deal Vouchers," with limited expiration periods in

violation of a variety of federal and state laws, including the Credit Card Accountability

Responsibility and Disclosure Act (the "CARD Act), Pub. L. No. 111-24, 123 Stat. 1734-1766

(codified in scattered sections of U.S.C.); the District of Columbia Consumer Protection Act

("CCPA"), D.C. Code § 28-3901 et seq.; and state gift certificate laws.  (See Consolidated

Amended Class Action Complaint [ECF No. 10] ("Compl.") ¶¶ 1, 5, 9).  The parties reached a

settlement that includes both injunctive and monetary relief for consumers who purchased

LivingSocial Deals prior to October 1, 2012, and received Deal Vouchers with allegedly illegal

_____
[1] Named plaintiffs are Melissa Forshey, Mandy Miller, Kimberly Pullman, Sarah Gosling, Dawn Abbott, Barrie Arliss, Cara Lauer, and Amy Schultz. (See Consolidated Amended Class Action Complaint ("Compl.") [ECF No. 10] at 1.)

expiration dates and other restrictions.  The parties now seek final approval of the settlement

agreement that this Court preliminarily approved on October 26, 2012.  Plaintiffs additionally

seek final certification of the class for settlement purposes only and approval of their attorneys'

fee application.

## BACKGROUND

### A.  LivingSocial

LivingSocial is a company that markets "Daily Deals" over the internet, offering

consumers a variety of goods and services from local merchants (such as co-defendant Jack's

Boathouse) at a discount.  (*See* Joint Motion for Final Approval of Class Action Settlement and

Plaintiffs' Motion for Class Certification [ECF No. 38] ("Final Approval Mot.") at 4.)  The Deal

Vouchers are generally divided into a "paid" portion, which is the actual amount paid for the

voucher, and a "promotional" portion, which is any amount above the paid portion of the

voucher.  (*See id.*)  Between when the company first began offering Daily Deals in 2009 and the

closing of the class period on October 1, 2012, approximately 10.9 million individuals

purchased defendants' vouchers.  (*See* 3/7/12 Fairness Hearing Transcript ("Tr.") at 4-5; Compl.

¶ 24.)

### B.  The Litigation

This litigation began as six separate suits, filed in various jurisdictions between February

and April of 2011.[2]  On May 2, 2011, LivingSocial filed a motion with the Judicial Panel on

---

[2] *Abbott v. LivingSocial, Inc.*, No. 11-0253 (W.D. Wash. *file*d Feb. 14, 2011); *Miller v. LivingSocial, C.A.*, 11-60519 (S.D. Fla. *filed* Mar. 11, 2011); *Forshey v. LivingSocial, Inc.*, No. 11-0745 (D.D.C. *filed* Apr. 19, 2011); *Pullman v. Hungry Machine, Inc.*, No. 11-0846 (S.D. Cal. *filed* Apr. 21, 2011); *Gosling v. Hungry Machine, Inc.*, No. 11-2094 (N.D. Cal. *filed* Apr. 28, 2011); *Schultz v. Hungry Machine, Inc.*, No. 11-1136 (D.M.N. *filed* Apr. 29, 2011).  (*See* Conditional Transfer Orders, dated 8/22/11 [ECF No. 1] and 9/7/11 [ECF NO. 3]; Final Approval Mot. [ECF No. 38] at 5).

Multidistrict Litigation ("JPML") to transfer the actions for coordinated or consolidated proceedings pursuant to 28 U.S.C. § 1407.  (*See* Joint Proposed Scheduling Order and Case Management Plan [ECF No. 5] at 1.)  On August 22, 2011, the JPML issued a transfer order with respect to five of the cases, and on September 7, 2011, it issued a second transfer order with respect to the sixth case.  (*See* Conditional Transfer Orders [ECF Nos. 1, 3].)

On November 4, 2011, plaintiffs filed a Consolidated Amended Class Action Complaint, asserting six claims against defendants: (1) violations of the CARD Act; (2) violations of twenty-seven state gift certificate statutes; (3) violations of the CCPA; (4) breach of contract; (5) quasi-contract, restitution, or unjust enrichment; and (6) declaratory or injunctive relief. Plaintiffs allege that the CARD Act's prohibition on the sale of gift certificates with expiration periods of less than five years is applicable to LivingSocial Deals, and that the inclusion of expiration dates violates a number of state laws pertaining to expiration dates on gift cards and gift certificates.  Plaintiffs also allege that Deal Vouchers include a number of other unfair or unconscionable terms, such as requiring that the entire Voucher be redeemed in a single transaction and not providing for any unused portion of the Voucher to be exchanged for cash.

The parties engaged in written discovery between November 2011 and April 2012.  (*See* Final Approval Mot. at 7-8.)  Since the parties were unable to resolve certain disagreements with respect to the scope of plaintiffs' discovery requests, on April 16, 2012, plaintiffs filed a motion to compel, which was fully briefed in May 2012.  (*See id*. at 8.)  In addition, defendants took the depositions of three of the named plaintiffs.  Additional deposition notices were served by both defendants and plaintiffs, but the action settled before any further depositions were conducted.  (*See id*.)  The parties, with the help of a mediator, reached a settlement prior to

conducting any expert discovery and prior to the resolution of the pending motions to dismiss and to compel.  (*See id*.)

### C.  The Settlement

Soon after the transfer order was entered, the parties engaged in settlement discussions, attending an in-person mediation before Judge Edward A. Infante (Ret.) of JAMS on August 30, 2011, and a second such session on June 14, 2012. (*See id*. at 9 (citations omitted).)  In addition to these two in-person mediations, the parties engaged in further discussions and negotiations under Judge Infante's supervision.  (*See id*. (citations omitted).)  The parties finally came to an agreement in principle, with the exception of attorneys' fees and expenses, which were negotiated after the other terms of the settlement were agreed upon.  (*See id*. at 10 (citation omitted).)  Through subsequent discussions, the parties worked out the details of the agreement, and on October 19, 2012, the parties filed the settlement agreement with the Court.  (*See* Settlement Agreement and Release ("Settlement Agreement") [ECF No. 24-1] at 6-10.)

The settlement terms ultimately agreed upon include both monetary and injunctive relief.  (*See id*.)  Under the agreement, LivingSocial agrees to pay $4.5 million into a settlement fund, out of which all claims will be paid, as well as the claims processing costs incurred by the settlement administrator.  (*See id*. at § 2.1(a), (c).)  Each claimant is entitled to a "one-time cash payment equal to the purchase price (also known as the "paid value") of unredeemed, expired LivingSocial Deal Vouchers, up to a maximum of 100%."  (*Id*. at § 2.2)  The agreement provides that if the claims exceed the fund, then payments to claimants will be reduced pro rata.  (*See id*. at § 2.2(a).)  It is now clear that the fund far exceeds the value of the filed claims, so there will be no pro rata reduction and all claimants will receive 100% of the paid value of each validly submitted unredeemed, expired Deal Voucher.  Claimants will receive payment between

thirty and forty-five calendar days after the final settlement date and after the claims processing

costs have been paid.  (*See id*. at § 2.2(c).)

The agreement also includes a provision for *cy pres* distribution.  Between thirty and

forty-five calendar days after the deadline for class members to cash their settlement checks,[3]

any funds remaining in the settlement fund will be paid as a *cy pres* distribution, divided equally

between National Consumers League and Consumers Union.  (*See id*. at § 2.3.)

The agreement also includes several forms of injunctive relief that LivingSocial will

institute within thirty days after the final settlement date and will maintain for three years.  (*See*

*id*. at § 2.4(a).)  First, for Deals that contain an expiration date and that can be broken into paid

value and promotional value, LivingSocial will more clearly identify and make more prominent

the paid and promotional values and the respective expiration dates on the Deal Vouchers and

on the LivingSocial website.  (*See id*. at § 2.4(a)(i).)  Second, for any LivingSocial Deal that can

be broken into paid and promotional values, the paid value shall not expire any sooner than the

period of expiry provided for by the CARD Act or under the state gift card/gift certification law

in which the merchant is located, whichever period is longer.  (*See id*. at § 2.4(a)(ii).)  Third,

LivingSocial will state in its terms and conditions that a purchaser may request a refund of the

paid value for any unredeemed Deal Voucher within seven days of purchase, and will include a

hyperlink to the terms and conditions in a prominent position on the Deal check-out page.  (*See*

*id*. at § 2.4(a)(iii), (iv).)  Fourth, LivingSocial will include in its terms and conditions a webpage

---

[3] Settlement class members who receive actual checks are given 180 calendar days to cash the checks, after which any funds from checks not cashed will be returned to the settlement fund.  If a settlement class member who elects electronic payment fails to provide accurate information to allow payment into an account, those funds will also revert to the settlement fund.  (*See* Agreement § 2.2(d).)

or webform to facilitate a refund request if the Deal is unredeemed and the merchant goes out of business before the promotional period expires.  (*See id*. at § 2.4(a)(v).)

The agreement also addresses plaintiffs' attorneys' fees and costs.  Plaintiffs agree to petition the Court for no more than $3 million in fees and costs, while defendants agree that they will not oppose any application in that amount.[4]  (*See id*. at § 2.5(a).)  The "attorneys' fees and costs fund" is paid into an interest-bearing escrow account separate and apart from the settlement fund.  (*See id*. at § 2.5(b).)  If the Court approves the award of attorneys' fees and costs, payment is to be made to class counsel within five business days after the entry of the Fairness Hearing Order and Judgment.  (*See id*. at § 2.5(e).)  The agreement also provides that "[w]ithin five (5) business days after payment of Class Counsel is complete, any funds remaining in the Attorneys' Fees and Costs Fund shall be paid into the Settlement Fund."  (*Id*. at § 2.5(f).)  The agreement further provides for incentive awards for the three named plaintiffs in the amount of $2,500 for plaintiffs who provided deposition testimony and $500 for those who did not.  (*See id*. at § 2.6.)

### D.  Preliminary Approval

The Court preliminarily approved the settlement agreement on October 26, 2012.  (*See* Preliminary Approval and Provisional Class Certification Order [ECF No. 28].)  Prior to granting approval, the Court indicated during a telephonic conference on October 12, 2012, that final approval would have to wait until the actual number of claimants and the value of the claims to be paid were known and that detailed billing records had to be submitted to support the attorneys' fee request.

---

[4] This is known as a "clear sailing" provision.  *See In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

### E.  Submitted Claims and Actual Expenses

According to the settlement administrator, 26,830 claims for settlement relief were completed, timely submitted, and validated, including both online and paper claim forms.  (*See* Declaration of Jennifer M. Keough in Support of Joint Motion for Final Approval of the Class Action Settlement ("Keough Decl.") [ECF No. 38-5] ¶ 18.)[5]  The aggregate dollar value of those claims is $1,894,803.70.  (*See id.*)  In addition, the claims processing costs that are to be deducted from the Settlement Fund under the terms of the Settlement Agreement are $53,951.44.  (*See id.* ¶ 19.)[6]  The sum of the cash relief to be distributed to class members and the total claims processing costs is therefore $1,948,755.14, leaving a residual of $2,551,244.86 to be designated as the *cy pres* award.  (*See* Pl. Resp. at 4.)

### F.  Objections

Class members have filed four formal objections to the settlement agreement.  Class members Frederic Fletcher and Katherine Schaffzin have objected to certain settlement terms,

---

[5] While 53,315 claim forms were submitted either by U.S. mail or online, it appears that some 26,485 claim forms were, for one reason or another, not "validated."  (*See* Keough Decl. ¶¶ 17, 18.)  During the Fairness Hearing, class counsel was unable to explain what occurred with those claims.  (*See* Tr. at 7.)  Defense counsel suggested that a certain number of potential class members may have begun to fill out a claim form before realizing that they did not actually have unredeemed, expired Vouchers, or that they could go to the merchant to redeem the paid value.  (*See id.* at 7-8.)  Regardless of the explanation, the bottom line is that only 26,830 class members will receive monetary benefit from this settlement, not the 53,315 that class counsel incorrectly represented repeatedly throughout their filings.  (*See, e.g.*, Plaintiffs' Response to the Court's February 12, 2013 Order and Opposition to Objections [ECF No. 40] ("Pl. Resp.") at 3-4, 8; Final Approval Mot. at 20, 21.)

[6] Plaintiffs have represented that the "Claims Processing Costs include the costs associated with processing online and paper claims, the operation of the interactive voice recording ("IVR") telephone line, responding to Class Member communications, and related project management." (Pl. Resp. at 4 (citing Keough Decl. ¶ 13; Agreement § 1.6).)  LivingSocial bears additional administrative costs, including "costs associated with the dissemination of email notice, website and online filing setup, and related project management."  (*Id.*)

but as explained herein, their objections are premised on a fundamental misunderstanding of the settlement or of the scope of the release.[7]  (*See* Fletcher Objection [ECF No. 34] and Schaffzin Objection [ECF No. 35].)  Class members Michelle Melton and Cery Perle, filing together, and Jeremy de la Garza object to the *cy pres* award and the attorneys' fee request.  (*See* Melton and Perle Objection [ECF No. 37] and De la Garza Objection [ECF No. 33].)  Fletcher objects to the fee request as well.  These objections will be addressed herein.

### G.  Pending before the Court

Currently pending are plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses and Incentive Award Payments [ECF No. 31] and the parties' Joint Motion for Final Approval of the Class Action Settlement and Plaintiffs' Motion for Class Certification [ECF No. 38].  In addition, as noted, four class members have filed objections to the settlement agreement, and plaintiffs have filed a response to those objections [ECF No. 40].[8]  A Fairness Hearing was held on March 7, 2013, at which objector Frederic Fletcher testified.

### ANALYSIS

### I.    CLASS CERTIFICATION

As a preliminary matter, the Court will certify the class for settlement purposes,[9] based on its finding that the class satisfies the prerequisites of Federal Rule of Civil Procedure 23(a)

---

[7] At the outset, the Court rejects the absurd notion that LivingSocial's alleged tax-preferred status in the District of Columbia has any bearing on this Court's impartiality or that it provides any basis for recusal.  (*See* Fletcher Obj. at 7-8.)

[8] Plaintiffs notified the Court that a number of "informal objections" were submitted through email, but were not served on the parties or filed with the Court.  (*See* Pl. Resp. at 23-25.)  The Court has reviewed these objections and finds that they are without merit.  (*See* Pl. Resp., Exs. 1-4.)

[9] The settlement class is defined as "all persons in the United States who purchased or received any Deal Vouchers prior to October 1, 2012."  (Agreement § 1.32.)

with respect to numerosity, commonality, typicality, and adequacy, as well as the prerequisites of Rule 23(b)(3) with respect to predominance and superiority.

### A. Rule 23(a) and (b)(3) Requirements

#### 1. *Numerosity*

Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The numerosity requirement is easily satisfied by the undisputed fact that LivingSocial has sold Deal Vouchers to 10.9 million individuals between 2009 and October 1, 2012, which has been defined as the class period.  (*See* Tr. at 4-5; *see also* Keough Decl. ¶ 8 (stating that notice of the proposed settlement was emailed to 10.9 million purchasers of Deal Vouchers).)

#### 2. *Commonality*

Another prerequisite of Rule 23(a) is that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Under Rule 23(a), commonality requires that plaintiffs advance a 'common contention' that 'must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012) (quoting *Wal-Mart v. Dukes*, 131 S.Ct. 2541, 2551 (2011)).  In this case, commonality is satisfied because the claims are based on the common contention that LivingSocial has sold each class member one or more Deal Vouchers with expiration dates that allegedly violate the CARD Act and various state gift certificate laws.

#### 3. *Typicality*

Under Rule 23(a), the Court must find that that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P.

23(a)(3).  Typicality is satisfied here because the claims of named plaintiffs and of class

members are based on the same core set of facts and underlying legal theory.  *See Trombley v.*

*Nat'l City Bank*, 826 F. Supp. 2d 179, 192-93 (D.D.C. 2011) (typicality is met when "each class

member's claim arises from the same course of events that led to the claims of the

representative parties" (internal quotation marks and citation omitted)).

### 4.   Adequacy

Finally, Rule 23(a) requires that "the representative parties will fairly and adequately

protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Court finds that the named

plaintiffs adequately represent the class and there is no conflict between the named plaintiffs'

interests and those of the class.  *See Trombley*, 826 F. Supp. 2d at 193.  Class member Schaffzin

objects, based on her misunderstanding of the settlement terms, that there is a conflict between

class representatives and class members because the named plaintiffs do not hold vouchers that

include both paid and promotional value, and "the sweeping definition of the class includes

those who hold the full face value of their vouchers."  (*See* Schaffzin Obj. at 9.)  While the class

is defined broadly, that provision of the agreement must be read alongside the provision

regarding the relief provided to the settlement class.  (*See* Agreement § 2.2.)  The relief

provision makes clear that only individuals who hold vouchers that are *expired*, unredeemed,

and not subject to a refund are entitled to receive monetary relief; therefore, those individuals

who hold vouchers that are still valid are unaffected by the settlement.  They neither can nor are

forced to exchange their unexpired vouchers for a cash payment under the settlement.  Thus,

there is no possible conflict.

Because plaintiffs have pursued this action under Rule 23(b)(3), they must meet two

additional criteria: common questions must "predominate over any questions affecting only

individual members" and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3)).  Factors relevant to this inquiry include:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).  When a class is being certified for settlement purposes only, "a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial.  But other specifications of the Rule – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention in the settlement context." *Amchem Prods.*, 521 U.S. at 620.

### 5. Predominance

Courts in this jurisdiction have found that the factor of predominance is satisfied by "generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *Trombley*, 826 F. Supp. 2d at 194 (internal quotation marks and citations omitted).  The predominant issues in this case are certain LivingSocial policies that are applicable to all class members and the question of LivingSocial's liability under the federal CARD Act.  Plaintiffs also allege that LivingSocial's policies violate various state gift certificate laws, which may differ with respect to the particular limits on expiration periods that they establish,[10] but "the

---

[10] For example, according to plaintiffs' representations, Arkansas's gift certificate statute, Ark. Stat. Ann. §4-88-703(a), (c), prohibits expiration periods of less than two years (*see* Compl. ¶ 138); Kentucky's statute, Ky. Rev. Stat. § 367.890(2), prohibits expiration periods of less than

existence of minor differences in state law does not preclude the certification of a nationwide

class." *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 116 (D.D.C. 2007).  The Court finds, therefore,

that the predominance requirement is met.

### 6.  Superiority

The purpose of the superiority requirement is to "ensure[] that resolution by class action

will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as

to persons similarly situated, without sacrificing procedural fairness or bringing about other

undesirable consequences.'"  *Trombley*, 826 F. Supp. 2d at 194 (quoting *Amchem Prods.*, 521

U.S. at 615).  As the Supreme Court has noted, "[t]he policy at the very core of the class action

mechanism is to overcome the problem that small recoveries do not provide the incentive for

any individual to bring a solo action prosecuting his or her rights."  *Amchem Prods.*, 521 U.S. at

617.  Accordingly, it is relevant to the superiority inquiry that "'[w]here it is not economically

feasible to obtain relief within the traditional framework of a multiplicity of small individual

suits for damages, aggrieved persons may be without any effective redress unless they may

employ the class-action device.'"  *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th

Cir. 2012) (quoting *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980)).  Because of

the small individual stakes involved here, this is the very type of case that would not likely be

pursued by in the absence of a class.  Thus, a class action is a superior mechanism.

The Court therefore concludes that the class satisfies all of Rule 23's prerequisites.

---

one year (*see id.* ¶ 145); Maryland's statute, Md. Comm. Code. Ann. § 14-1319(b), prohibits
expiration periods of less than four years (*see id.* ¶ 148); while California's corresponding
statute, Cal. Civ. Code § 1749.5(a)(1), Connecticut's statute, Conn. Gen. Stat. Ann. § 42-460(a),
and Florida's statute, Fla. Stat. Ann. §501.95(d)(a), prohibit the imposition of *any* expiration
dates.  (*See id.* ¶¶ 139, 140, 141.)

## II.   NOTICE TO SETTLEMENT CLASS

Under Rule 23, "the court must direct to class members the best notice that is practicable

under the circumstances, including individual notice to all members who can be identified

through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

> The notice must clearly and concisely state in plain, easily understood language:
> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class
> claims, issues, or defenses; (iv) that a class member may enter an appearance
> through an attorney if the member so desires; (v) that the court will exclude form
> the class any member who requests exclusion; (vi) the time and manner for
> requesting exclusion; and (vii) the binding effect of a class judgment on members
> under Rule 23(c)(3).

*Id*.

Having carefully examined both the short-form and long-form notices that were issued

to class members, the Court has no difficulty finding that notice was adequate.  Objector

Schaffzin's misunderstanding of the terms of the settlement renders her arguments about the

inadequacy of these notices and the online claim forms meritless.  (*See* Schaffzin Obj. at 10.)

## III.   REASONABLENESS OF SETTLEMENT

Having found that the class should be certified, the Court now turns to consider the

reasonableness of the settlement to determine if it should be approved.

### A.  General Principles of Law Under Rule 23

Whether a proposed class action settlement should be approved lies within the sound

discretion of the district court.  *See In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 103

(D.D.C. 2004).  Rule 23(e) provides that "[t]he claims, issues, or defenses of a certified class

may be settled, voluntarily dismissed, or compromised only with the court's approval."  "The

Court must eschew any rubber stamp approval . . . yet, at the same time, must stop short of the

detailed and thorough investigation that it would undertake if it were actually trying the case."

*Id.* (citation omitted).  "[I]n passing on the proposed settlement agreement, the district court has a duty under Fed. R. Civ. P. 23(e) to ensure that it is fair, adequate, and reasonable and is not the product of collusion between the parties."  *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 30 (D.C. Cir. 2000) (citations omitted).

There is "no single test" for settlement approval in this jurisdiction; rather, courts have considered a variety of factors, including: "(a) whether the settlement is the result of arms-length negotiations; (b) the terms of the settlement in relation to the strengths of plaintiffs' case; (c) the status of the litigation proceedings at the time of settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel."  *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 375 (D.D.C. 2002) ("*Lorazepam I*") (collecting cases).  The Court will address each in turn.

### 1.  Arms-Length Negotiations

"A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.'"  *Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104 (quoting Manual for Complex Litig. § 30.42).  Class counsel and defense counsel are experienced in litigating class actions, including actions pertaining to gift certificate laws.  (*See* Final Approval Mot. at 13.) Counsel engaged in adversarial, arms-length negotiations that extended over more than a year, while simultaneously conducting discovery.  (*See id*. at 14.)  Judge Infante, an experienced mediator who oversaw the settlement negotiations, has indicated in a sworn statement that "[t]here was never any type of collusion between the Parties in any of the negotiations," adding that those negotiations "were intense at every step of the way, and the Parties vigorously

advocated for their respective positions." (Declaration of Hon. Edward A. Infante (Ret.) ("Infante Decl.") [ECF No. 38-4] ¶¶ 1, 10.)

While objector Fletcher alleges, without support, that "[t]he Settlement favors LivingSocial to such an unprecedented degree that collusion must have occurred" (Fletcher Obj. at 4), his assumption is based on a flawed understanding of the settlement agreement and the release. Fletcher incorrectly interprets the settlement as releasing LivingSocial from "the same egregious conduct into perpetuity," by "provid[ing] indefinite immunities for claims not accrued, and parties presently unaffected." (*See id*. at 1, 5.) As made clear during the Fairness Hearing, the settlement agreement only releases *claims* based on vouchers purchased prior to October 1, 2012; it does not release any and all future claims made by any person who may have purchased a voucher prior to October 1, 2012. (*See* Tr. at 34-36; Agreement § 5.1 (releasing claims "arising out of or relating to any of the acts, omissions, or other conduct that was or could have been alleged in the Actions").) In other words, LivingSocial is released from liability with respect to certain claims, not certain individuals.[11]

Mr. Fletcher's argument that the settlement agreement renders the CARD Act inapplicable is likewise meritless. (*See* Fletcher Obj. at 7.) To the contrary, under the terms of the settlement, LivingSocial agrees that for three years, the Vouchers it issues will have expiration dates that are no shorter than the five years required by the CARD Act (and in some cases longer, if required by the applicable state gift certificate laws). (*See* Agreement § 2.4.)

---

[11] Objector Katherine Schaffzin argues that the settlement "forces class members to forfeit 100% of the paid value remaining in their Vouchers to join a class, which, in the best possible scenario, will offer 100% of the paid value of the voucher back to the class member." (Schaffzin Objection [ECF No. 35] at 4.) Ms. Schaffzin is incorrect. As plaintiffs explain, under the terms of the settlement, "Class Members will be entitled to monetary relief if they purchased or received a Deal Voucher that has expired, remains unredeemed and was not subject to a refund." (Pl. Resp. at 9 (citing Agreement § 2.2).)

After the settlement period ends, LivingSocial will be still be bound to follow the law, including

the CARD Act to the extent that it applies to Deal Vouchers.  The Court thus rejects Fletcher's

objections, and concludes that the settlement was the product of arms-length negotiations.

       2.   *Terms of Settlement in Relation to Strength of Plaintiffs' Case*

The settlement agreement provides for monetary and injunctive relief for millions of

LivingSocial customers nationwide.  (*See* Final Approval Mot. at 15.)  LivingSocial will pay

$4,500,000 into the Settlement Fund, which will provide complete relief to class members who

have submitted valid claims – that is, each claimant will receive 100% of the paid value of their

expired, unredeemed Vouchers.  (*See id*. at 16.)   Indeed, now that the claims period has closed,

it is clear that the Settlement Fund is significantly larger than necessary to satisfy the submitted

and validated claims.  Once all claims for refunds for expired and unredeemed Deal Vouchers

have been fully satisfied, the remaining funds will be distributed as *cy pres* awards to two non-

profit organizations with missions that are aligned with plaintiffs' interests and closely

approximate the purpose of the suit.  (*See id*.)

In addition, the settlement agreement includes injunctive relief requiring LivingSocial to

follow certain practices for three years after the final settlement date.  (*See id*. at 17.)  As

detailed above, these changes include what is essentially an agreement to abide by the five-year

expiration period of the CARD Act (or pertinent state gift certificate laws that may prescribe

longer expiration periods) and a series of changes that will make LivingSocial's disclosures of

its policies more transparent and effective.  In fact, according to counsel for LivingSocial (*see*

Tr. at 12, 26) and plaintiffs' filing (*see* Pl. Resp. at 12), these practices are already in place at

LivingSocial, having been instituted beginning shortly after the first suit was filed on February

14, 2011.

These benefits to the class must be considered in juxtaposition with the risks attendant to continued litigation of this matter.  *See Lorazepam I*, 205 F.R.D. at 377.  Defendants assert that they have strong defenses, which might have foreclosed the possibility of any class-wide recovery, in the absence of a settlement.  (*See* Final Approval Mot. at 17.)  They maintain that plaintiffs would be unlikely to succeed in establishing that Deal Vouchers are, or should be, regulated as "gift certificates" under federal or state law.  (*See id*. at 18.)  In addition, they argue that even if Deal Vouchers are considered gift certificates, the relevant gift certificate regulations expressly permit the placement of expiration dates on the Vouchers' promotional (as opposed to paid) value.  (*See id*.)  If the litigation had progressed, defendants would have also contended that individual issues predominate over common issues, thereby precluding class certification under Rule 23(b)(3).  (*See id*. at 19.)

### 3.  Status of Litigation Proceedings at Time of Settlement

Courts also "'consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-a-vis the probability of success and range of recovery.'"  *Chilcott*, 522 F. Supp. 2d at 117 (quoting *In re Lorazepam & Clorazepate Antitrust Litig*., 2003 WL 22037741, at *4 (D.D.C. June 16, 2003) ("*Lorazepam II*")).  In this case, the parties engaged in written discovery, with defendants producing 29,000 documents, consisting of more than 73,000 pages, and more than 100 megabytes of electronically stored information.  (*See* Final Approval Mot. at 20; Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Award Payments ("Pl. Fee Mot.") [ECF No. 31] at 10.)  Defendants noticed the depositions of all named plaintiffs and deposed three.  (*See* Final Approval Mot. at 20.)  As a result, the parties had sufficient information to have a realistic assessment of their prospects in the litigation.  The parties briefed a motion to dismiss and a

motion to compel, but had not reached the point of briefing summary judgment motions.  The

Court therefore finds that the settlement "does not 'come too early to be suspicious nor too late

to be a waste of resources' but is rather "at a desirable point in the litigation for the parties to

reach an agreement and to resolve these issues without further delay, expense, and litigation.'"

*Chilcott*, 522 F. Supp. 2d at 117 (quoting *Vitamins Antitrust Litig.,* 305 F. Supp. 2d at 105.)

### 4. Reaction of the Class

Four formal objections have been filed in this case, along with four "informal"

objections that were not properly served on the parties or the Court and contained minimal

information.  This is not a significant number of objections.  While the Court agrees that some

of the objections raised valid points with respect to attorneys' fees, it rejects the objections

regarding the settlement and the *cy pres* award, for they are largely based on misreading the

terms of the settlement.  In addition, there have been 361 valid requests for exclusion from the

class, which is also not a significant number, in view of the size of the class and the more than

26,000 claims submitted.   (*See* Final Approval Mot. at 21.)

### 5. Opinion of Experienced Counsel

Courts in this jurisdiction have noted that "[t]he opinion of experienced counsel 'should

be afforded substantial consideration by a court in evaluating the reasonableness of a proposed

settlement.'"  *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 565 F. Supp. 2d 49, 58 (D.D.C.

2008) (quoting *Lorazepam II*, 2003 WL 22037741, at *6.)  The experienced counsel involved in

this case are obviously of the opinion that the settlement is fair, reasonable and adequate, and as

noted, no one has seriously disputed this position.  (*See* Final Approval Mot. at 21-22 (citations

omitted).)

**B.  *Cy Pres* Award**

The Court finds that the two organizations that have been designated to receive *cy pres* awards out of the residual funds after claimants are fully compensated are appropriate choices. Consumers Union, which is the non-profit policy and advocacy arm of Consumer Reports, is dedicated to "work for a fair, just, and safe marketplace for all consumers, and to empower consumers to protect themselves."  (Declaration of Ellen Bloom, Senior Director, Consumers Union [ECF No. 38-2] ¶ 3.)  Consumers Union played a role in securing the passage of the CARD Act of 2009, and in particular, the gift card provision in the law.  (*See id.* ¶ 6.)   The organization has engaged in other legislative and public advocacy efforts relating to the "pitfalls and hidden costs of gift cards."  (*Id.* ¶ 8.)  The Court finds that the interests and activities of Consumers Union are thus directly aligned with those advanced in this lawsuit.

Similarly, National Consumers League ("NCL") is dedicated to "protect[ing] and promot[ing] social and economic justice for consumers and workers in the United States and abroad."  (Declaration of Sally Greenberg, Executive Director, NCL [ECF No. 38-3] ¶ 3.)  NCL has been involved in a range of consumer protection activities, including issues relating to gift cards.  NCL supported passage of the CARD Act and has advocated for measures designed to protect consumers from abusive gift cards practices in the District of Columbia and Maryland. (*See id.* ¶¶ 6, 7.)  So, as is the case with Consumers Union, NCL's interests and activities are aligned with those of this lawsuit.

Indeed, the *cy pres* beneficiaries here are far better choices than were the intended *cy pres* beneficiaries in *In re Groupon, Inc., Mktg. and Sales Practices Litig.* ("*Groupon*")*,* No. 11-md-2238 (S.D. Cal. *consolidated* June 2, 2011).  In *Groupon*, counsel argued that the intended *cy pres* beneficiaries – the Electronic Frontier Foundation and the Center for Democracy and

Technology – were sufficiently related to the case because the "Class Members are Internet users whose claims arise from Groupon's purportedly unlawful online marketing and sales practices," while the beneficiaries were "two advocacy organizations dedicated to pursuing Internet consumer rights." Order Denying Joint Motion for Final Approval of Class Action Settlement, *Groupon*, No. 11-md-2238, *slip op* at *15 (S.D. Cal. Sept. 28, 2012). The *Groupon* court rejected the *cy pres* provision, finding that there was no "driving nexus" between the "claims alleged in the case and the *cy pres* beneficiary." *See id*. In addition, the claims period in *Groupon* did not close before final approval of the settlement agreement, so it was possible that the *cy pres* award would have been distributed before all class members had been fully compensated for their losses.

In contrast, the intended beneficiaries of the *cy pres* award in this case are sufficiently aligned with the claims in the lawsuit. Furthermore, the claims period has already closed, and it is readily apparent that all claimants will be fully compensated for their losses. Therefore, it is appropriate for the residual funds to go to two non-profit organizations that are dedicated to the public interest, particularly where the alternatives would be to return the funds to defendant, thereby reducing the deterrent effect of the suit, or to escheat to the state. Objector De la Garza argues that the residual funds should escheat to the U.S. government, or, in the alternative, be used for pro rata distribution beyond the value of the unused voucher, because the class complaint sought punitive damages. (*See* De la Garza Obj. at 1.) Because the Court does not find any of these alternatives to be preferable, it will approve the *cy pres* beneficiaries as designated.[12]

_____

[12] The Court also takes note of, but rejects as baseless, the objection that "the *cy pres* distributions to these organizations do not further the interest of the class members" because "[n]either of [the designated] organizations appear to deal with the prevention of unfair and

Although there are grounds to argue that the amount of the *cy pres* award is disproportionate in relation to the recovery by the class, the Court will nonetheless approve it. In this regard, the Court recognizes the Third Circuit's recent pronouncement that "[b]arring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds." *In re Baby Products Antitrust Litig.*, 2013 WL 599662, at *5 (3d Cir. 2013). But in that case, a fund of approximately $21.5 million was designated for the class, but only approximately $3 million actually ended up being distributed to the class, leaving a *cy pres* award of $18.5 million. *Id.* at *1. The sheer disproportion between the awards going to claimants and the award going to *cy pres* beneficiaries clearly factored into the Third Circuit's decision to reverse the district court's approval of the settlement. More significantly, however, the Third Circuit held that the district court "did not have the factual basis necessary to determine whether the settlement was fair to the entire class," and "did not know the amount of compensation that will be distributed directly to the class." *Id.* at *7.

In the instant case, by contrast, all of those numbers are now known. The claims period has ended and the number of claims and the value of those claims are known. The amount of the *cy pres* award  ($2.5 million, plus any amounts not distributed from the Attorneys' Fees and Cost Fund) as compared to the direct benefit to claimants (just under $1.9 million), while far from ideal, is not nearly as lopsided as in *Baby Products*. Claimants will receive full relief, and it is more desirable for the residual funds to go to the *cy pres* beneficiaries, than back to LivingSocial. Moreover, several courts in this jurisdiction have approved similar *cy pres* awards. *See, e.g.*, *In re Dep't of Veterans' Affairs Data Theft Litig.*, 653 F. Supp. 2d 58, 61

---

deceptive business practices, which was the intended purpose of the class action here." (*See* Melton and Perle Obj. at 3-4.) On the contrary, these two organizations do work on issues directly related to the subject of this suit.

(D.D.C. 2009) (approving settlement agreement including *cy pres* award likely to be more than

$14 million compared to $2.1 million directly distributed to plaintiffs); *Radosti v. Envision EMI,*

*LLC*, 760 F. Supp. 2d 73, 75 (D.D.C. 2011) (approving settlement agreement including *cy pres*

award of $3.69 million with $8 million in direct distribution); *Diamond Chem. Co. v. Akzo*

*Nobel Chemicals B.V.*, 517 F. Supp. 2d 212, 215, 220-21 (D.D.C. 2007) (approving *cy pres*

distribution of $5.1 million out of $12.9 million settlement fund); *cf. Boyle v. Giral*, 820 A.2d

561, 565 n.6, 570 (D.C. 2003) (approving settlement with $107 million distributed to consumer

class while $107 million intended for consumer class designated as a *cy pres* award because of

impracticality of distributing directly to consumer class members).  Nonetheless, as other judges

in this jurisdiction have done, the Court will take into consideration the relatively small

proportion of the settlement fund that provides direct monetary relief to claimants when it

determines attorneys' fees.  *See In re Dep't of Veterans' Affairs Data Theft Litig.*, 653 F. Supp.

2d at 61 (taking into account "the peculiar balance between the return to class members and the

size and nature of the *cy pres* contribution" in determining fee award).

### C.  Conclusion

For the above reasons, the Court finds, consistent with Fed. R. Civ. P. 23(e), that the

settlement agreement is fair, adequate, and reasonable and the result of arms-length

negotiations.  The settlement provides for full economic recovery by claimants, as well as

injunctive relief that may provide some benefits to future LivingSocial customers.  The Court

will also approve the reasonable incentive awards, which are $2500 for the three named

plaintiffs who were deposed and $500 for the remaining named plaintiffs, for a total of $10,000.

(*See* Final Approval Mot. at 10).

**IV.     LEGAL FEES**

The Court will now turn to the vexing issue of attorneys' fees, which is, unfortunately, one of the central issues in this case, as it is in most class action litigation.  It is especially challenging here, since only 26,830 class members out of a possible 10.9 million will recover $1,894,803 (or approximately $70 per class member), but the attorneys seek $3 million in fees and costs.

**A.  Governing Principles of Law**

 "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h). However, "[a]n award of attorneys' fees must be reasonable in light of the results obtained."  *In re Dep't of Veterans' Affairs Data Theft Litig.*, 653 F. Supp. 2d at 60.  The D.C. Circuit has held that "a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases."  *Swedish Hosp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993).  While "fee awards in common fund cases may range from fifteen to forty-five percent," *Lorazepam II*, 2003 WL 22037741, at *7, "a majority of common fund class action fee awards fall between twenty and thirty percent."  *Swedish Hosp.*, 1 F.3d at 1272.

Courts frequently use the lodestar as a cross-check on the propriety of fees awarded under the percentage-of-the-fund method, sometimes adjusting the percentage or the award upward or downward accordingly.  *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("[I]t is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation."); *Goldberger v. Integrated Res., Inc.*, 209 F. 3d 43, 50 (2d Cir. 2000) ("[T]he lodestar remains useful as a baseline . . . we encourage the practice of requiring

documentation of hours as a 'cross check' on the reasonableness of the requested percentage."); Manual for Complex Litig. (Fourth) (2009) § 14.121 n.504 (collecting cases); *id*. § 14.122.

Under the lodestar method, "an attorney's usual billing rate is presumptively the reasonable rate, provided that the rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Kattan by Thomas v. District of Columbia*, 995 F. 2d 274, 278 (D.C. Cir. 1993) (quoting *Blum v. Stenson*, 465 U.S. 886, 895-96 n. 11 (1984)).  However, courts have reduced the lodestar in cases in which it is apparent that counsel's calculations are suspect.  *See, e.g., Miller v. Holzmann*, 575 F. Supp. 2d 2, 45 (D.D.C. 2008) (reducing attorneys' fees by 25.5 percent based on ambiguous time entries, block billing, inefficient staffing, and erroneous inclusion of clerical work), *vacated in part on separate grounds by United States ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, 608 F.3d 871 (D.C. Cir. 2010); *Muldrow v. Re-Direct, Inc*., 397 F. Supp. 2d 1, 4-5 (D.D.C. 2005) (reducing attorneys' fees by 25 percent because of disproportion between fee request and size of judgment in "relatively straightforward negligence suit").

### B.  Plaintiffs' Position

Plaintiffs have requested an award of $3,000,000 for fees and expenses, which defendants have agreed not to oppose.  (*See* Pl. Fee Mot. at 13.)  They argue that this amount is justified by "the comprehensive settlement benefits achieved on behalf of the Settlement Class, as well as the time, effort and resources expended by Plaintiffs' Counsel in successfully prosecuting this Action to conclusion."  (*Id*.)  They suggest that the requested fee award is fair and reasonable as a percentage of the "total constructive common fund" and when cross-checked against the lodestar.  (*Id*. at 13-14.)

24

Plaintiffs frame their fee request as constituting "less than 5%" of the "constructive common fund," which they value at $62 million, including "the value of the cash relief available to the Settlement Class and certain administrative costs ($4,5000,000), the additional administration costs borne by LivingSocial (approximately $80,000), the agreed-upon amount of attorneys' fees and expenses ($3,000,000) and the value of the injunctive relief ($54 million at the low end)."  (*Id*. at 4.)  Regarding the lodestar cross-check, plaintiffs maintain that their total lodestar is $2,025,465.50 for 4,012.50 hours of work, in addition to $43,297 in expenses. (*See* Notice of Errata [ECF Doc. 39] at 1; Pl. Fee Mot. at 29.)[13]  They suggest, therefore, that their fee request represents a "modest multiplier of less than 1.5 times the lodestar."  (*See* Pl. Fee Mot. at 4.)

### C.  *Lorazepam* Factors

Plaintiffs contend that their fee request is reasonable under the *Lorazepam* factors, which Judge Hogan adopted from the Third Circuit in the absence of any definitive test in this Circuit. Those factors include:

> (1) The size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Lorazepam II*, 2003 WL 22037741, at *8.  Of these factors, the most significant factor here is the size of the fund, which in turn depends on whether injunctive relief should be valued at $54 million and whether it should be included in the fund.

---

[13] Plaintiffs originally represented that their lodestar was $2,037,278.75, but submitted a Notice of Errata on February 25, 2013, notifying the Court that the hourly rates for attorneys Shawn Wanta and Melissa Wolchansky at Halunen & Associates had been incorrectly listed as $750.00 rather than the correct hourly rate of $425.00, due to "an internal clerical error."  (Notice of Errata at 1.)

1.   *The Size of the Fund and Number of People Who Will Benefit*

a. *The Fund*

The Court rejects plaintiffs' attempt to value the common fund at $62 million.  While there are many cases where courts have taken the fact of "valuable" injunctive relief into account in awarding attorneys' fees, the Court is unaware of any case where a fund has been defined to include the supposed value of the injunctive relief to the class members.  *See, e.g., Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1343 (S.D. Fla. 2007) (acknowledging the "important injunctive relief," but not discussing a particular dollar value); *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 388 (S.D.N.Y. 2005) ("Rather than attempt to assign a specific dollar value to the Structural Changes, the Court is acknowledging that they do benefit the Class by awarding legal fees at the upper end (30%) of the Settlement Value commonly awarded under the percentage method, although still substantially lower than the fees sought by counsel."); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003) (the court accounted for the "substantial injunctive relief" while still reducing fees from $660 million to $220 million).[14]

Because the value of injunctive relief can be so difficult to quantify, some courts have opted to use the lodestar method in jurisdictions in which they have the discretion to use either the lodestar or the percentage-of-the-fund method.  *See, e.g., In re HP Laser Printer Litig.*, 2011 WL 3861703, at *5 (C.D. Cal. 2011); *In re Bluetooth Headset Prods. Liab. Litig.*, 2012 WL 6869641, at *8 n.24 (C.D. Cal. 2012) (choosing not to "treat[] the settlement as a common fund due to the excessive degree to which various assumptions about the value of the injunctive relief can manipulate  the attorney's fee award").

---

[14] At the Fairness Hearing, plaintiffs' counsel was unable to cite any case where the fund has been calculated to include a specific amount representing the value of the injunctive relief to the plaintiff class.  (*See* Tr. at 20-21.)

In the few cases where courts have accepted that the injunctive relief may be worth a particular amount, their acknowledgment of that figure appears to have made little to no difference in their ultimate calculations.  For instance, in *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 478 (D.N.J. 2008), the court accepted the parties' valuation of the injunctive relief and made a fee award that "represents just over 32% of the common fund of $215 million and 28% of the $249 million value of the common fund plus the parties' lowest estimated value of the injunctive relief."  In that case, it was clear that whether the injunctive relief was included, the fee award did not deviate much from the standard range of awards, and resulted in only a four percentage point difference.  Meanwhile, in the sole case cited by plaintiffs where the court did incorporate the injunctive relief into the value of the common fund, the court awarded fees in the amount of 12.9% of the fund, well below the 20-30% general range of awards in common fund cases.  *See Sheppard v. Consol. Edison of New York*, 2002 WL 2003206, at *7 (E.D.N.Y. 2002).  Also, that case involved $6.745 million in monetary relief and "an estimated $5 million in non-monetary, injunctive relief," which was based on the estimated cost to the defendant of implementing the changes, rather than the economic value of those changes to the class.  *Id*.

This Court believes there is a significant difference between valuing injunctive relief based on concrete figures as to the cost to defendant of *implementing* the relief and representing approximately 40% of the fund (as in *Sheppard*), and this case, where plaintiffs propose valuing injunctive relief based on speculation about consumer behavior and rough estimates of the economic consequences thereof, which would represent an astonishing 87% of the fund.  *See Kings Choice Neckwear, Inc. v. DHL Airways, Inc.*, 2003 WL 22283814, at *4 (S.D.N.Y. Oct.

2, 2003) ("[T]he value of the injunction differs enormously depending on whether it is considered from the viewpoint of the plaintiffs or defendants.")[15]

In this regard, the Court is persuaded by the Ninth Circuit's rationale in *Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003), where the court observed:

> only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees. When this is not the case, courts should consider the value of the injunctive relief obtained as a relevant circumstance in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as a part of the fund itself.

(internal quotation marks and citations omitted). Consistent with this reasoning, the Court will consider the injunctive relief as a "relevant circumstance," but it will not increase the common fund by $54 million. Plaintiffs' estimates of the value of the injunctive relief are simply too speculative.[16] While the injunctive relief is not worthless, to value it at $54 million serves no

_____

[15] LivingSocial's counsel made clear at the Fairness Hearing that the injunctive relief does not actually cost the company anything. (*See* Tr. at 43-44 ("[T]he fact is LivingSocial does not benefit economically if the voucher is not redeemed . . . The changes in practice that the company has instituted that it will be enjoined to continue under the settlement agreement are not directly relevant to the company's bottom line financially. They don't affect the manner or the means or the amount of revenue.").)

[16] The Court acknowledges that plaintiffs have submitted the expert report of Alexander Hoinsky to support their request of $54 million for injunctive relief. The Hoinsky report, however, is of marginal value. He suggests a wide range of possible values for the injunctive relief ranging from $54 million to $216 million. (*See* Expert Report of Alexander Hoinsky Report, Ex. 1 to Pl. Fee Mot. [ECF No. 31-1].) In his calculations, Hoinsky starts with the imprecise estimate that between 5% and 21% of Deal Vouchers expire and go unredeemed each year. He then projects "the impact at three levels of additional redemption [of Deal Vouchers] by Class Members resulting from the Settlement Agreement: two and one-half percent (2.5%), five percent (5%) and ten percent (10%)," and reduces those figures to present value at a "conservative ten percent (10%) present value rate." *Id*. at 6. He arrives at the following present values for the five-year period from 2013 through 2017: $54,040,699 at 2.5%; $108,081,397 at 5.0%; and $216,162,793 at 10.0%. (*See id*.) Without the benefit of the adversarial process, the Court is unable to assess the reliability of this report. However, it is apparent that the projections used do not support a finding regarding the "'undisputed and

useful purpose other than to inflate the fund for purposes of lowering the percentage of the fund represented by the fee request.

In addition, the value of the injunctive relief to prospective LivingSocial consumers is far from clear.  First, the extent to which LivingSocial's policies with respect to expiration dates have changed is ambiguous at best.  Even plaintiffs' characterization of the value of the injunctive relief is far from compelling: they note that "as a direct result of this Settlement, LivingSocial has agreed to *maintain its current practice* of not placing an expiration date on the paid value of any Deal Voucher that is shorter than the five-year period of expiry set forth by the CARD Act . . . for at least three years," and "LivingSocial will *maintain its current practice* of providing clear and conspicuous disclosures explaining the difference between the paid value and promotional value on its Deal Vouchers, as well as on its Company website."  (Pl. Resp. at 12 (emphasis added).)  Admittedly, certain policy changes were made subsequent to the filing of this suit,[17] but, as made clear by defense counsel, "under the CARD Act, the notion of a paid promotional split is *something that the company has always recognized*. And via this settlement, the company has made clear and added additional disclosures regarding the nature of that split and the duration of the paid value which, of course, is five years under the CARD Act -- and in many states, perpetual -- as opposed to the promotional value."  (Tr. at 26 (emphasis added).) Moreover, it is unclear if LivingSocial's expiration policies before this suit was filed were considerably different from the practices prescribed by the settlement agreement.  (*See* Compl. ¶ 38 ("LivingSocial attempts to circumvent federal and state gift certificate laws by inserting a

---

mathematically ascertainable'" value of the injunctive relief to each class member, as would be necessary to award fees on that basis.[16]  *See Staton*, 327 F. 3d at 972 (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 478-79 (1980)).

[17] *See* Tr. at 10 ("The practices that are listed in the settlement agreement that LivingSocial has agreed to continue and maintain for the three-year period were instituted after the first lawsuit in what became this MDL.")

disclaimer on some LivingSocial gift certificates in which it claims its expiration terms do not apply to any prepaid portion of the gift certificates"); Tr. at 45 (LivingSocial's counsel explaining that the settlement term providing for a full refund if the merchant goes out of business before the expiration of the promotional period "is primarily one of disclosure in that it is now clear to LivingSocial's customers and class members that that, in fact, is going to be the practice in the event of a merchant going out of business").)

Second, whenever these policies were implemented and even if the injunctive relief did cause the implementation of better disclosure practices, the major thrust of the injunctive relief is, in essence, an agreement by LivingSocial to abide for three years by what plaintiffs claim is required by law.  (*See* Tr. at 25 (class counsel agreeing with the Court's assessment that injunctive relief requires LivingSocial to abide by "an expiration date that at least purportedly is federally mandated").)  Moreover, the injunctive relief provides limited direct benefit to class members since they bought their Vouchers prior to October 2012 and the injunctive relief applies only to prospective purchasers who may or may not have bought in the past.  *See Staton*, 327 F.3d at 974.

Rather than attempting to disguise the size of their fee request by painting it as "less than 5%" of a $62 million fund (Pl. Fee Mot. at 4), it would have been preferable for counsel to have acknowledged that the common fund consists only of the monetary relief plus fees and costs (or $7.5 million) and then to have requested a fee of $3 million, which amounts to 40% of the fund.[18]

---

[18] It is notable that the same attorneys did not assign any value to the injunctive relief in *Groupon*, even though it was similar to the relief obtained here and involved a potential class of over 14 million Groupon customers.  Plaintiffs' counsel attributed this significant difference in approach to the fact that the *Groupon* case was riskier given the mandatory arbitration clause

### b.  *Number Who Will Benefit*

As far as the number of people who will benefit, 26,830 valid claims have been submitted, representing a mere .25% of the purported class of 10.9 million.  While the number of people is not negligible and those individuals will receive 100% of the paid value of their Deal Voucher, the recovery by each person amounts to approximately $70.00.  Furthermore, even the $4.5 million in monetary relief includes less than $2 million in direct benefits to class members while awarding a *cy pres* of more than $2.5 million.  The Court is cognizant that generally "the percentage applies to the total fund created, even where the actual payout following the claims process is lower."  *Pinto*, 513 F. Supp. 2d at 1339.  However, it is also appropriate to consider the proportion of the award that is going to *cy pres* when assessing the benefit of the settlement to the class and the corresponding calculation of attorneys' fees.  *See In re Dep't of Veterans' Affairs Data Theft Litig.*, 653 F. Supp. 2d at 61 ("Here, I believe the proportional size of the *cy pres* contribution counsels an award that is at the low end, or even below the low end, of the standard range.")

### 2.  *Objections to Settlement Terms and/or Fees Request*

As discussed above, only four formal objections have been filed.  The objections to the settlement terms are largely meritless, but the Court agrees with those objectors who have challenged the size of the fee request.  While four is not a large number of objections, the fact that few objections have been made is not necessarily an indication of the value of the suit. *See, e.g., Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 258 (E.D.N.Y. 2009) ("While the number of objections and exclusions constitutes only a small fraction of the Class,

---

(*see* Tr. at 14), but as noted by LivingSocial's counsel, the arbitration issue affected a certain percentage of the class here as well.  (*See id.* at 16.)

the Court does not attribute a great deal of significance to the number given the low stakes of a

$5 settlement and the burden on each objector to provide their written objections in triplicate,

buy three stamps and mail copies to the Court, Class Counsel and defense counsel.").

### 3.  Skill and Efficiency of Attorneys Involved

The attorneys involved in this matter are clearly experienced class action attorneys.  The

Court harbors some doubt, however, as to whether the litigation was prosecuted in the most

efficient manner possible. Forty-six lawyers at twelve firms billed time to this case, and at one

of the two firms that served as lead class counsel, every attorney in the firm – seventeen in all –

billed time to this litigation.  (*See* Tr. at 27.)  At a minimum, this is a highly inefficient way of

doing business.  *See Miller*, 575 F. Supp. 2d at 40-41 ("too many attorneys were assigned to

discrete tasks," including eleven attorneys working on one deposition and seven attorneys

working on a fifth amended complaint).

### 4.  Complexity and Duration of Litigation

The litigation lasted just over two years from the filing of the first complaint on

February 14, 2011, to the Fairness Hearing on March 7, 2013.  This is a relatively brief time

span for an MDL action.  It also involved only six cases, which is a relatively small MDL.

Although there were novel issues of law regarding the CARD Act, all of these issues had to be

researched first in *Groupon* by the same firm, Robbins Gellar, that served as co-lead class

counsel in this case.  While, as noted by plaintiffs' counsel, the *Groupon* case settled early in

the litigation because plaintiffs faced a risk of being forced into individual arbitration, the

instant case also settled relatively quickly and it presented no new legal issues. (*See* Tr. at 15.)

Therefore, this factor argues against a high percentage fee award.

### 5. Risk of Nonpayment

Because there were several novel legal issues and other hurdles, such as a potential cap on damages for CARD Act claims and the possibility that varying state laws could pose a bar to class certification, class counsel assumed a degree of risk in pursing this case since they were not guaranteed to receive compensation for their work and time.

### 6. Amount of Time Devoted by Plaintiffs' Counsel

According to the time records and representations of plaintiffs' counsel, they spent substantial time on this matter – a total of 4,012 attorney and paralegal hours.  As noted, however, this number may not reflect the complexity of the case as much as the inefficiencies involved in prosecuting a class action where twelve law firms (and forty-six lawyers)[19] were involved.  Furthermore, the class action plaintiffs' lawyers are unconstrained by market forces; they do not regularly charge by the hour, they have no clients to monitor their billings, and there is no real incentive to be efficient or to cut hours or rates.  As a result, the number of hours spent by these lawyers and paralegals is of limited use in assessing plaintiffs' fee request.

### 7. Awards in Similar Cases

Courts in this jurisdiction have generally awarded fees ranging from 20-30% with some exceptions based on the particular circumstances of the case.  *See In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14, 22 (D.D.C. 2003) (awarding 28%); *Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10 (D.D.C. 2001) (awarding 34%); *Radosti,* 760 F. Supp. 2d at 78 (awarding 33%); *Lorazepam II*, 2003 WL 22037741, at *9 (awarding 30%); *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 7 (D.D.C. 2008) (approving 45% award "in this unique case"); *In re Dep't of Veterans' Affairs Data Theft Litig.*, 653 F. Supp. 2d at 61 (awarding 18% due to "the peculiar

---

[19] Admittedly, eight of the lawyers on plaintiffs' team account for 2,584 of the 4,012 hours spent on this litigation.

balance between the return to class members and the size and nature of the *cy pres* contribution").

In the case most similar to this one – *Groupon* – plaintiffs' counsel sought and were awarded 25% of the common fund, which amounted to $2,125,000.  Class counsel tries to distinguish that case by arguing that they were forced to resolve the case quickly because of the threat of forced arbitration, and thus, they did not seek as much in fees as they perhaps might have, but rather, they agreed to a fee that was significantly less than their lodestar of $2.9 million.  (*See* Pl. Resp. at 5-6).  Class counsel also correctly maintains that the settlement in this case is superior to the *Groupon* settlement because class members receive more complete compensation through a less convoluted process.  (*See id*.)  However, they concede that *Groupon* was riskier, larger, and more legally complex because of the arbitration issue, than this case.  (*See* Tr. at 14, 19-20.)

Furthermore, the *Groupon* settlement fund was larger ($6.375 million v. $4.5 million (excluding attorneys' fees in each case)); it represented a larger potential class (14.2 million class members v. 10.9 million class members); and even though the claims period in *Groupon* has hardly begun, more claimants have stepped forward (61,245 as of February 2, 2013 v. 26,830) and a greater amount of the fund has been claimed ($2.428 million v. $1.89 million). (*See* Pl. Resp. at 8; Order Denying Joint Motion for Final Approval of Class Action Settlement, *Groupon*, 11-md-2238, *slip op*. at *4 (S.D. Cal. Sept. 28, 2012); Order Approving Class Action Settlement, *Groupon*, 11-md-2238, *slip op* at *7 (S.D. Cal. Dec. 18, 2012).)  And, as noted, although the injunctive relief in both cases was similar, counsel did not attempt to value the injunctive relief achieved in *Groupon*, while here they claim that the injunctive relief is "conservatively valued at $54 million at a minimum." (*See* Pl. Fee Mot. at 15.)  Given this

comparison between the cases, there is *no* compelling rationale for awarding counsel here $1 million more than they received in *Groupon*.

### D.  Lodestar Cross-Check

With respect to the lodestar, it too is of minimal value as a cross-check on the requested percentage of the fund.  First, the 4,012 hours spent litigating this matter over two years when only three depositions were taken and two motions were briefed seems excessive.  With twelve firms involved, certain inefficiencies and redundancies were inevitable, but, as noted, the number of lawyers (forty-six) who spent time on this matter and the obvious lack of any market restraints on the amount of time spent[20] causes the Court to be highly skeptical of counsel's claim that the number of hours is reasonable.[21]

Furthermore, the Court is unwilling to accept the high hourly rates that were billed by some of the plaintiffs' lawyers.[22]  It is noteworthy that most of the attorneys who were involved in both this matter and in *Groupon* have increased their billing rates 10%-20% between the filing of their two fee petitions.[23]  In the instant case, plaintiffs' counsel have calculated their lodestar based on 2013 billing rates, even though the work was done in 2011 and 2012.  The

---

[20] As stated at the Fairness Hearing, the Court cannot accept class counsel's contention that their hours are "governed by the market because federal judges have to approve our rates."  (Tr. at 30.)

[21] For example, Michael McShane of Audet & Partners was not one of the lead class counsel, but he billed a surprisingly significant 143 hours at a rate of $695 per hour. (*See* Declaration of Michael McShane [ECF No. 32-2] at 2.)

[22] For instance, several partners at the two lead law firms billed between $800 and $850 per hour, and numerous others billed between $700 and $750.  (*See* Declaration of Charles LaDuca [ECF No. 32] at 15; Declaration of Thomas Merrick [ECF No. 32-1] at 12; Declaration of Clayton Halunen [ECF No. 32-6] at 3; Declaration of Charles Schaffer [ECF No. 32-8] at 2.)

[23] The lawyers in *Groupon* filed their fee request in June 2012 using 2012 rates, whereas the lawyers here filed their request in February 2013 and used 2013 rates.

Supreme Court and lower courts have held that where payment is delayed in fee-shifting cases, a court may compensate for the time value of money by either using historic billing rates plus interest[24] or by using present-day rates. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *Mathur v. Bd. of Tr. of S. Illinois Univ.*, 317 F.3d 738, 274-75 (7th Cir. 2003). However, a significant number of those cases, including *Missouri v. Jenkins*, dealt specifically with fee shifting under 42 U.S.C. § 1988 in protracted civil rights litigation. This case cannot be compared to those cases. Counsel here is facing a delay in payment of a year or two at the most. But since this is a percentage-of-the-fund case, the Court does not need to resolve the question of whether to use 2013 rates, historic rates with interest, or historic rates without interest. Nonetheless, counsel's use of 2013 rates in their lodestar does cast further doubt on the validity of using plaintiffs' $2 million lodestar as a cross-check.

In support of their claimed rates, counsel invokes PricewaterhouseCoopers ("PwC") survey data. (*See* Pl. Fee Request at 28; Declaration of Charles LaDuca ("LaDuca Decl.") [ECF No. 32], Ex. 2.) Significantly, this data reflects nationwide rates, not local rates. Furthermore, plaintiffs do not provide any affidavits regarding local rates of the sort that are commonly submitted with fee requests. In such a situation in this jurisdiction, the default standard for calculating appropriate hourly rates is the *Laffey* Matrix. *See Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F. 2d 4 (D.C. Cir. 1984); *see also Miller*, 575 F. Supp. 2d at 18 n.29 (noting that *Laffey* matrix is "the benchmark for reasonable fees in this Court" (quotation marks and citation omitted)); *Heller v. District of Columbia*, 832 F.Supp.2d 32, 48 (D.D.C. 2011) (awarding fees based on *Laffey*

---

[24] Of course, the certificate of deposit interest rate was .42% in 2011 and .44% in 2012. *See* "Selected Interest Rates – H.15," Historical Data for CDs (secondary market) 6-month annual report, Bd. Of Governors of the Federal Reserve System, http://www.federalreserve.gov/releases/h15/data.htm.

Matrix).  For, as the D.C. Circuit has observed, the updated *Laffey* Matrix prepared by the United States Attorneys' Office is evidence of prevailing market rates for litigation counsel in the Washington, D.C. area.  *See Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n.14, 1108, 1109 (D.C. Cir. 1995) ("plaintiff must produce data concerning the prevailing market rates in the relevant community").

Several of the attorneys who have billed the most hours in this case have used rates that far exceed the rates established by the updated *Laffey* Matrix.  For example, Michael McShane of Audet & Partners in San Francisco billed 143.75 hours at a rate of $695.00 per hour.  Mr. McShane had 25 years of experience when this suit began in 2011, so under the *Laffey* Matrix, his hourly rate for 2011-2012 would have been $495 and for 2012-2013 it would be $505.  (*See* Declaration of Michael McShane ("McShane Decl.") [ECF No. 32-2] at 2.)  Charles LaDuca of Cuneo Gilbert & LaDuca in Washington, D.C. billed 233.75 hours at $600 per hour.  With 10 years of experience when the suit began, under the *Laffey* Matrix, his hourly rate for 2011-2012 would have been $350 and for 2012-2013 it would be $355.  (*See* LaDuca Decl. at 15-16.) William Anderson, also of Cuneo Gilbert, billed 543.25 hours at $500 per hour. As of 2011, he had seven years of experience, which under the *Laffey* Matrix places him at $285 in 2011-12 and $290 in 2012-2013.  (*See id*.)

Furthermore, as courts in this jurisdiction have noted, "[t]he market generally accepts higher rates from attorneys at firms with more than 100 lawyers than from those at smaller firms—presumably because of their greater resources and investments, such as attorneys, librarians, researchers, support staff, information technology, and litigation services." *Heller,* 832 F.Supp.2d at 46-47 (quotation marks and citation omitted).  Here the vast majority of plaintiffs' counsel practice in small firms and they offer no plausible justification for claiming

that they are entitled to the large firm rates reflected in the PwC survey.  (*See* Declaration of

Thomas Merrick [ECF No. 32-1] at 16; LaDuca Decl., Ex. 1; McShane Decl., Ex. 1;

Declaration of Sean Gillespie [ECF No. 32-5], Ex. 1; Declaration of Christopher Ellis [ECF No.

32-3], Ex. 1; Declaration of Elaine Ryan [ECF No. 32-4], Ex. 1; Declaration of Charles Schaffer

[ECF No. 32-8], Ex. 1.)  Indeed, even in large firms, lawyers often do not bill at their reported

rates or, in the alternative, they discount their bills because they must compete in the

marketplace for business.  *See, e.g.*, Catherine Ho, "Is Time Running Out on the Billable

Hour?," WASH. POST, Jan. 15, 2012 (Capital Business) (describing commonly available billing

discounts and alternative fee arrangements).

In sum, the lodestar hardly serves as a cross-check on the percentage-of-the-fund in this

case.  Regardless of whether the multiplier is fair, the evidence as to rates and as to hours does

not support a lodestar of $2 million.[25]

Based on the factors used in *Lorazepam*, the Court has decided to apply a percentage

below the standard range and award 18% of the $7.5 million fund.[26]  A modest percentage is

---

[25] Milton, Perle, and De La Garza object to the "quick pay" provision that allows class counsel
to be paid in short order, even if an appeal is taken, and the provision that lead class counsel will
be responsible for distributing the fee award to the other plaintiffs' firms.  (*See* Milton and Perle
Obj. at 9-10; Garza Obj. at 4-6.)  There is ample authority for the "quick pay" provision.  *See,
e.g.*, *In re Chipcom Corp. Sec. Litig.*, 1997 WL 1102329, at *10 (D. Mass. June 26, 1997)
(approving settlement stipulation authorizing payment of attorneys' fees upon entry of judgment
"despite the existence of any objections filed to the Fee and Expense Award, the potential for
Appeal from the Fee and Expense Award, or collateral attack on the Settlement or any part
thereof"); *Turabo Med. Ctr. v. Beach*, 1997 WL 33810581, at *5 (D.P.R. Aug. 13, 1997)
(ordering payment of attorneys' fees within 30 days of entry of final approval order); *Gilman v.
Independence Blue Cross*, 1997 WL 633568, at *15 (E.D. Pa. Oct. 6, 1997) (ordering fees and
costs to be paid from the settlement fund 31 days after entry of final approval order).
    As for the lack of specificity as to fee division among plaintiffs' counsel, that is not the
Court's concern.  *See Bowling v. Pfizer*, 102 F.3d 777, 781 (6th Cir. 1996) ("As long as class
and special counsel are paid only what their collective work is worth, their distributions among
themselves, even if done in a manner unrelated to the services a particular counsel has
performed for the class, will in no way harm the class or negatively impact the fund from which
the class's benefit is measured[.]").

appropriate in this case given the limited value of the direct benefits to the class members, the small number of class members who will benefit, the proportionally large *cy pres* distributions in comparison to the monetary relief awarded to the class members, and the somewhat dubious value of the injunctive relief, especially as to those class members who do not intend to purchase Deal Vouchers in the next three years.

## CONCLUSION

For the reasons stated above, the Court grants the parties' Joint Motion for Final Approval of the Class Action Settlement and Plaintiffs' Motion for Class Certification and grants in part plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses and Incentive Award Payments.  The Court awards fees of $1,350,000, plus $43,297.18 in costs to plaintiffs' counsel; incentive awards of $10,000 in total to the named plaintiffs; and *cy pres* distributions of $4,157,947.68 to be divided equally between Consumers Union and National Consumers League.  A separate order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE: March 22, 2013

---

[26] *See* Tr. at 22 (class counsel acknowledging that "[w]ithout a monetary valuation of the injunctive relief," the common fund would be valued at $7.5 million).